[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Citizens Not Politicians v. Ohio Ballot Bd.*, Slip Opinion No. 2024-Ohio-4547.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-4547

THE STATE EX REL. CITIZENS NOT POLITICIANS ET AL. *v.* OHIO BALLOT BOARD ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Citizens Not Politicians v. Ohio Ballot Bd.*, Slip Opinion No. 2024-Ohio-4547.]**

*Elections—Mandamus—Initiative—Proposed constitutional amendment—Ballot language—Ohio Const., art. II, § 1g—Ohio Const., art. XVI, § 1—Ballot title—R.C. 3519.21—Writ sought to compel secretary of state to reconvene the Ohio Ballot Board to adopt new ballot language for proposed amendment to Ohio Constitution and to compel the secretary to adopt new ballot title for the proposed amendment—Writ granted in part and denied in part.*

(No. 2024-1200—Submitted September 12, 2024—Decided September 16, 2024.)

IN MANDAMUS.

————————————

The per curiam opinion below was joined by KENNEDY, C.J., and FISCHER, DEWINE, and DETERS, JJ. FISCHER, J., authored a concurring opinion. DONNELLY, J., concurred in part and dissented in part, with an opinion joined by STEWART, J. BRUNNER, J., concurred in part and dissented in part, with an opinion joined by DONNELLY and STEWART, JJ.

**Per Curiam.**

{¶ 1} On November 5, 2024, Ohio voters will consider Issue 1, a constitutional amendment proposed by initiative petition. If approved, the amendment would repeal Articles XI and XIX of the Ohio Constitution and add Article XX, thereby changing the standards and procedures applicable to the drawing of electoral districts for the General Assembly and the United States House of Representatives. Among other features, the amendment proposes to create a 15-member redistricting commission with responsibility to adopt redistricting plans.

{¶ 2} Relators challenge the ballot language adopted by respondents Ohio Ballot Board and its members[1] and the ballot title adopted by respondent Secretary of State Frank LaRose. In relators' view, the ballot language and the title are misleading. Relators seek a writ of mandamus ordering the secretary to reconvene the ballot board to adopt new language and directing the secretary to adopt a new title. We grant the writ in part and deny it in part.

{¶ 3} Also pending is (1) the ballot board's motion to strike the answer of Senator Paula Hicks-Hudson and Representative Terrence Upchurch, who are the two dissenting members of the ballot board, and (2) Senator Hicks-Hudson and Representative Upchurch's motion for leave to withdraw that answer. We grant the motion for leave and deny as moot the motion to strike.

---

1. The individual members of the ballot board are respondents Secretary of State Frank LaRose (also the chair of the board), Senator Theresa Gavarone, Senator Paula Hicks-Hudson, William Morgan, and Representative Terrence Upchurch.

## I.  BACKGROUND

**{¶ 4}** Relator Citizens Not Politicians is a committee that describes itself as a coalition of people and organizations that seeks to end gerrymandering in Ohio by removing politicians from the redistricting process, with the hope of achieving fair and impartial state legislative and congressional districts through an open and independent process.  The remaining relators are Ohio resident-electors who are members of the committee that represent the petitioners proposing the amendment.

**{¶ 5}** On July 23, 2024, Secretary LaRose announced the certification of the proposed amendment that would appear on the November ballot.  The announcement also noted that the next steps in the process would entail a meeting of the Ohio Ballot Board to consider the ballot language and a ballot title.

**{¶ 6}** On August 16, the ballot board met to consider the ballot language and title.  The Ohio Constitution provides that the ballot board shall prescribe ballot language "in the same manner, and subject to the same terms and conditions, as apply to issues submitted by the general assembly pursuant to Section 1 of Article XVI of [the Ohio] constitution."  Ohio Const., art. II, § 1g.  Under that process, ballot language must be prescribed by a majority of the ballot board.  Ohio Const. art. XVI, § 1.  The ballot board consists of the "secretary of state and four other members . . . not more than two of whom shall be members of the same political party."  *Id.*  The ballot language must "properly identify the substance of the proposal to be voted upon" but "need not contain the full text nor a condensed text of the proposal."  *Id.*  This court may not hold ballot language invalid "unless it is such as to mislead, deceive, or defraud the voters."  *Id.* The ballot board does not determine the title of the proposed amendment, rather, by statute, the secretary of state determines the title.  R.C. 3519.21.

**{¶ 7}** By a three-to-two vote, the ballot board approved language for the proposed constitutional amendment.  The approved language is as follows:

## Issue 1

### To create an appointed redistricting commission
### not elected by or subject to removal by the voters of the state

**Proposed Constitutional Amendment**

**Proposed by Initiative Petition**

To repeal Sections 1, 2, 3, 4, 5, 6, 7, 8, 9 and 10 of Article XI,
Repeal sections 1, 2 and 3 of Article XIX,
And enact Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of Article XX of the Constitution
of the State of Ohio

**A majority yes vote is necessary for the amendment to pass.**

The proposed amendment would:

1. Repeal constitutional protections against gerrymandering approved by nearly three-quarters of Ohio electors participating in the statewide elections of 2015 and 2018, and eliminate the longstanding ability of Ohio citizens to hold their representatives accountable for establishing fair state legislative and congressional districts.

2. Establish a new taxpayer-funded commission of appointees required to gerrymander the boundaries of state legislative and congressional districts to favor either of the two largest political parties in the state of Ohio, according to a formula based on partisan outcomes as the dominant factor, so that:
    A. Each district shall contain single-member districts that are geographically contiguous, but state legislative and congressional districts will no longer be required to be compact; and
    B. Counties, townships and cities throughout Ohio can be split and divided across multiple districts, and preserving communities of interest will be secondary to the formula that is based on partisan political outcomes.

3. Require that a majority of the partisan commission members belong to the state's two largest political parties.

4. Prevent a commission member from being removed, except by a vote of their fellow commission members, even for incapacity, willful neglect of duty or gross misconduct.

5. Prohibit any citizen from filing a lawsuit challenging a redistricting plan in any court, except if the lawsuit challenges the proportionality standard applied by the

commission, and then only before the Ohio Supreme Court.

6. Create the following process for appointing commission members: Four partisan appointees on the Ohio Ballot Board will choose a panel of 4 partisan retired judges (2 affiliated with the first major political party and 2 affiliated with the second major political party). Provide that the 4 legislative appointees of the Ohio Ballot Board would be responsible for appointing the panel members as follows: the Ballot Board legislative appointees affiliated with the same major political party would select 8 applicants and present those to the Ballot Board legislative appointees affiliated with the other major political party, who would then select 2 persons from the 8 for appointment to the panel, resulting in 4 panel appointees. The panel would then hire a private professional search firm to help them choose 6 of the 15 individuals on the commission. The panel will choose those 6 individuals by initially creating a pool of 90 individuals (30 from the first major political party, 30 from the second major political party, and 30 from neither the first nor second major political parties). The panel of 4 partisan retired judges will create a portal for public comment on the applicants and will conduct and publicly broadcast interviews with each applicant in the pool. The panel will then narrow the pool of 90 individuals down to 45 (15 from the first major political party; 15 from the second major political party; and 15 from neither the first nor second major political parties). Randomly, by draw, the 4 partisan retired judges will then blindly select 6 names out of the pool of 45 to be members of the commission (2 from the first major political party; 2 from the second major political party; and 2 from neither the first nor second major political parties). The 6 randomly drawn individuals will then review the applications of the remaining 39 individuals not randomly drawn and select the final 9 individuals to serve with them on the commission, the majority of which shall be from the first and the second major political parties (3 from the first major political party, 3 from the second major political party, and 3 from neither the first nor second major political parties).

7. Require the affirmative votes of 9 of 15 members of the appointed commission to create legislative and congressional districts. If the commission is not able to determine a plan by September 19, 2025, or July 15 of every year ending in one, the following impasse procedure will be used: for any plan at an impasse, each commissioner shall have 3 days to submit no more than one proposed redistricting plan to be subject to a commission vote through a ranked-choice selection process, with the goal of having a majority of the commission members rank one of those plans first. If a majority cannot be obtained, the plan with the highest number of points in the ranked-choice process is eliminated, and the process is repeated until a plan receives a majority of first-place rankings. If the ranked-choice process ends in a tie for the highest point total, the tie shall be broken through a random process.

8. Limit the right of Ohio citizens to freely express their opinions to members of the commission or to commission staff regarding the redistricting process or proposed

redistricting plans.

9. Require the commission to immediately create new legislative and congressional districts in 2025 to replace the most recent districts adopted by the citizens of Ohio through their elected representatives.

10. Impose new taxpayer-funded costs on the State of Ohio to pay the commission members, the commission staff and appointed special masters, professionals, and private consultants that the commission is required to hire; and an unlimited amount for legal expenses incurred by the commission in any related litigation.

If approved, the amendment will be effective 30 days after the election.

| | YES | SHALL THE AMENDMENT BE APPROVED? |
|---|-----|---|
| | NO | |

{¶ 8} Three days later, on August 19, relators filed this original action for a writ of mandamus against the ballot board and its members. Relators seek a writ ordering the secretary to reconvene the ballot board to adopt new ballot language and directing the secretary to adopt a new ballot title. Relators' prayer for relief extends to sections one, two, three, four, five, eight, nine, and ten of the ballot language; the lawfulness of sections six and seven are not at issue.

{¶ 9} The parties have submitted evidence and briefs as prescribed by this court's rule applicable to expedited-election cases. *See* S.Ct.Prac.R. 12.08. Several amicus curiae briefs have also been filed.

## II. ANALYSIS

### A. *Motion to strike and motion for leave*

{¶ 10} The ballot board has filed a motion to strike an answer filed by Senator Hicks-Hudson and Representative Upchurch, the two members of the ballot board who opposed the adoption of the ballot language. Relators sued

Senator Hicks-Hudson and Representative Upchurch in their official capacities as members of the ballot board, but the board's overarching argument is that the answer filed by Senator Hicks-Hudson and Representative Upchurch should be stricken because only the attorney general is authorized to defend and enforce the decisions of multimember bodies such as the ballot board. This authority, the board says, necessarily precludes nonprevailing ballot-board members from litigating a losing position in court.

{¶ 11} After the ballot board filed its motion to strike, Senator Hicks-Hudson and Representative Upchurch filed a motion for leave to withdraw their answer. We grant the motion for leave for two reasons. First, relators do not oppose it. And second, although the ballot board opposes it on the ground that allowing the withdrawal will deprive this court of an opportunity to clarify the scope of the attorney general's authority, withdrawing the motion effectively grants the relief the ballot board has sought through its motion to strike.

{¶ 12} Because we grant the motion for leave, we deny the motion to strike as moot.

### B. Mandamus

{¶ 13} To be entitled to a writ of mandamus, relators must establish a clear legal right to the requested relief, a clear legal duty on the part of the ballot board or the secretary to provide it, and the lack of an adequate remedy in the ordinary course of the law. *See State ex rel. One Person One Vote v. Ohio Ballot Bd.*, 2023-Ohio-1928, ¶ 5. Due to the proximity of the November 5 election, relators lack an adequate legal remedy in the ordinary course of the law to challenge the ballot language adopted by the ballot board and the ballot title adopted by the secretary. *See State ex rel. Voters First v. Ohio Ballot Bd.*, 2012-Ohio-4149, ¶ 22. An analysis under the first two elements asks "whether the [ballot] board engaged in fraud or corruption, abused its discretion, or acted in clear disregard of applicable law." *State ex rel. Brubaker v. Lawrence Cty. Bd. of Elections*, 2022-Ohio-1087, ¶ 10.

Our review of the ballot language is further prescribed by the Ohio Constitution. We may not find ballot language invalid unless its effect is to "mislead, deceive, or defraud voters." Ohio Const., art. XVI, § 1.

### 1. The ballot language

{¶ 14} Relators challenge eight sections of the ballot language. Therefore, we must determine whether the ballot language is written in such a way so as to "mislead, deceive, or defraud the voters," Ohio Const., art. XVI, § 1. In applying this standard, the court "examine[s] whether the language tells voters what they are being asked to vote on and whether the language impermissibly amounts to persuasive argument for or against the issue." *One Person One Vote* at ¶ 8. If ballot language tells voters what they are being asked to vote on and does not amount to impermissible persuasive argument, we have no authority to invalidate it. *See id.* at ¶ 7-8. But "[i]f there are defects in ballot language, we examine the defects as a whole and determine whether their cumulative effect violates the constitutional standard." *Id.* at ¶ 8.

{¶ 15} Ballot language properly tells voters what they are being asked to vote on when it is both (a) factually accurate and (b) there are no material omissions. *See, e.g.*, *Voters First* at ¶ 29-30, 52, 55 (applying the constitutional standard by looking for factual inaccuracies and material omissions); *One Person One Vote* at ¶ 9-22 (same); *State ex. rel. Ohioans United for Reproductive Rights v. Ohio Ballot Bd.*, 2023-Ohio-3325, ¶ 17-21 (lead opinion) (same). Ballot language is factually inaccurate if it would lead a reasonable voter to draw a conclusion about the proposed amendment that is false. *See State ex rel. Cincinnati Action for Hous. Now v. Hamilton Cty. Bd. of Elections*, 2021-Ohio-1038, ¶ 12, citing *State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections*, 2013-Ohio-4489, ¶ 34, citing *Voters First* at ¶ 47. An omission of information in ballot language is material if "'its absence . . . affect[s] the fairness or accuracy of the text.'" *Ohioans United for Reproductive Rights* at ¶ 20 (lead opinion), quoting *Voters First* at ¶ 30.

Ballot language does not amount to impermissible persuasive argument if it is (a) factually accurate and (b) addresses a subject that is in the proposed amendment itself. *Ohioans United for Reproductive Rights* at ¶ 44 (lead opinion); *Cincinnati Action for Hous. Now* at ¶ 15, 26; *Cincinnati for Pension Reform* at ¶ 48-49.

### i. Section one

{¶ 16} Relators first challenge section one of the ballot language, which addresses the changes to Ohio's constitutional system of redistricting that would result from passage of the proposed amendment. Section one states that the proposed amendment would "[r]epeal constitutional protections against gerrymandering approved by nearly three-quarters of Ohio electors participating in the statewide elections of 2015 and 2018, and eliminate the longstanding ability of Ohio citizens to hold their representatives accountable for establishing fair state legislative and congressional districts." Although the ballot language does not say so expressly, the "repeal" to which it refers is a reference to the fact that the proposed amendment would repeal Articles XI and XIX in their entirety. The procedure for drawing state legislative districts is set forth in Article XI, and the procedure for drawing congressional districts is set forth in Article XIX.

{¶ 17} Relators begin by challenging section one's reference to the vote margin accompanying the passage of Articles XI and XIX and the method (i.e., statewide election) of the amendments' adoption. They maintain that the inclusion of such information is tantamount to an argument against adopting the proposed amendment, asserting that the information is being included to persuade voters that current law is popular. The lone precedent relators cite in support of this argument is *One Person One Vote*, 2023-Ohio-1928, at ¶ 10-12, in which this court held that ballot language need not describe the legal status quo to meet the standards required under Article XVI, Section 1. *See id.* at ¶ 15-17. In so holding, we did not rule out the permissibility of what the ballot board did here. At worst, the ballot board's inclusion of the vote margin and vote method could be questioned on relevance

grounds. But it cannot be questioned on accuracy grounds. This information is factually accurate, and relators have not shown that the information would "mislead, deceive, or defraud the voters," Ohio Const., art. XVI, § 1.

{¶ 18} Next, relators claim that it is misleading and prejudicial for section one to describe the proposed amendment as effecting a "[r]epeal [of] constitutional protections against gerrymandering." In their view, this language is inaccurate campaign rhetoric designed to persuade. Article XVI, Section 1 of the Ohio Constitution states that the "ballot language shall properly identify the substance of the proposal to be voted upon." Relators go astray in calling the ballot language inaccurate given that this court has characterized the 2015 passage of Article XI and the 2018 passage of Article XIX as reflecting an "overwhelming[] vote[] [by Ohio voters] to impose constraints on the government's ability to draw districts based on partisan gerrymandering," *Adams v. DeWine*, 2022-Ohio-89, ¶ 3; *see also id.* at ¶ 33 (observing that "the Ohio constitution expressly forbids partisan gerrymandering" in discussing Article XIX); *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65, ¶ 101 ("*LWV*") (describing Article XI as an "anti-gerrymandering amendment"). Moreover, because the proposed amendment contemplates the repeal of Articles XI and XIX, there is nothing unfair about the ballot language addressing this subject too. *Cincinnati Action for Hous. Now*, 2021-Ohio-1038, at ¶ 15 ("The proposed amendment addresses the appropriation of funds, so it is fair for the ballot language to also address that topic."). It follows that because the clause that relators attack is factually accurate and germane to the proposed amendment, the clause is not forbidden persuasion. *Id.* at ¶ 26 ("if ballot language is factually accurate and addresses a subject that is in the proposed amendment itself, it should not be deemed argumentative").

{¶ 19} For their third argument, relators cursorily argue that it is "nonsense" for the ballot language to state that the proposed amendment would "eliminate the longstanding ability of Ohio citizens to hold their representatives accountable for

establishing fair state legislative and congressional districts." But the ballot language's statement is self-evidently true. Relators fail to cite even one instance in which someone other than an elected representative from Ohio cast a vote for or against an Ohio state legislative or congressional redistricting plan.[2] Indeed, as a matter of historic practice, legislative involvement in the redistricting process has been the rule, not the exception. *See Wilson v. Kasich*, 2012-Ohio-5367, ¶ 20, citing *Ely v. Klahr*, 403 U.S. 108, 114 (1971) ("districting and apportionment are legislative tasks in the first instance"). And elected officials are accountable, because they are elected to office and subject to removal by the voters. *See Chambers v. St. Mary's School*, 1998-Ohio-184, ¶ 16 ("Members of the General Assembly are accountable to their constituents because they are elected to office. If the constituents are unhappy with policy determinations made by members of the General Assembly, they can change the makeup of the General Assembly at the voting booth." [citation omitted]). The ballot language is factually accurate and the subject is addressed by the proposed amendment itself.

**{¶ 20}** Last, relators point to ballot language that the ballot board adopted for a marijuana-related constitutional amendment proposed in 2015. That language, relators say, illustrates what neutral ballot language should look like and demonstrates that the ballot board is capable of drafting neutral language when it wants to. Relators' reliance on past ballot language is unpersuasive because under this court's precedent, "[p]ast practice does not inform whether the ballot language at issue in this case will 'mislead, deceive, or defraud the voters,' " *One Person One Vote*, 2023-Ohio-1928, at ¶ 16, quoting Ohio Const., art. XVI, § 1.

**{¶ 21}** We conclude that section one of the ballot language is not defective.

---

2. Current law permits individuals who are not elected representatives to sit on the redistricting commission but requires that those individuals be appointed by a member of the General Assembly. *See* Ohio Const., art. XI, § 1(A). Here, however, relators do not contend that any member of the most recent redistricting commission was not an elected representative.

### ii.  Section two

{¶ 22} Relators next challenge section two of the ballot language, which relates to the standards for drawing redistricting boundaries.  Section two provides that the proposed amendment would

> [e]stablish a new taxpayer-funded commission of appointees required to gerrymander the boundaries of state legislative and congressional districts to favor the two largest political parties in the state of Ohio, according to a formula based on partisan outcomes as the dominant factor, so that:
>
> . . .
>
> B.       Counties, townships and cities throughout Ohio can be split and divided across multiple districts, and preserving communities of interest will be secondary to the formula that is based on partisan outcomes.

{¶ 23} Relators argue that the ballot language is false because it tells the voters that the proposed amendment would require gerrymandering even though the proposed amendment states that it "ban[s] partisan gerrymandering and prohibit[s] the use of redistricting plans that favor one political party and disfavor others," Proposed Amendment at § 6(B).  In support of this argument, they observe that the attorney general approved as "fair and truthful" their ballot summary, which contained language that is substantively identical to that which is quoted in the prior sentence.  They further argue that the proposed amendment contains features contained in current law that this court has previously described as anti-gerrymandering.

{¶ 24} To begin with, the fact that the attorney general approved relators' ballot summary does not answer the question presented here.  The ballot board—

not the attorney general—is entrusted with drafting the ballot language. Ohio Const., art. XVI, § 1. And it is the ballot language, not the attorney general's approval of relators' summary, that is before us. Next, the fact that the proposed amendment announces that it would "ban partisan gerrymandering," Proposed Amendment at § 6(C), is of little assistance in ascertaining whether the ballot language's use of the word "gerrymander" is improper. The question is not how the amendment's proponents describe the plan but whether the ballot board's adopted language "is such as to mislead, deceive, or defraud the voters," Ohio Const., art XVI, §1.

{¶ 25} The proposed amendment specifies criteria that the new commission is to follow in drawing district lines. Aside from specifying that districts must be contiguous and comply with federal law, the amendment makes only one other criterion paramount: districts must be drawn to elect Republicans and Democrats in proportion to their statewide vote totals. As to this partisan-district-makeup standard, the amendment provides that "the statewide proportion of districts in each redistricting plan that favors each political party *shall* correspond closely to the statewide partisan preferences of the voters of Ohio" (emphasis added), Proposed Amendment at § 6(B). It then prescribes a formula for calculating the statewide proportion of districts in each redistricting plan that favors each of the two major political parties and the statewide partisan preferences of the voters of Ohio, and it establishes that "to correspond closely means that the statewide proportion of districts in each redistricting plan that favors each political party may deviate by no more than" 3 percent unless arithmetically impossible. *Id.* at § 6(B)(1) through (3).

{¶ 26} The proposed amendment specifies other objectives, such as creating districts that are "reasonably equal in total population," protecting the ability of "politically cohesive and geographically proximate racial, ethnic, and language minorities" to elect candidates, and "preserv[ing] communities of interest to the extent practicable." Proposed Amendment at § 6(C). But it makes clear that the

new commission only needs to satisfy these criteria "to the extent possible" and never at the expense of the paramount requirement of drawing districts designed to achieve outcomes proportional to the partisan political makeup of the state. *Id.*

{¶ 27} Thus, the question that we confront is whether it is "misleading" for the ballot board to describe as "gerrymandering" a process that requires the new commission to draw districts to achieve specified partisan political outcomes at the expense of other neutral redistricting criteria such as compactness and maintaining geographic boundaries.

{¶ 28} We begin with the commonly understood meaning of the word "gerrymander." "In determining the plain and ordinary meaning of a word, courts may look to dictionary definitions of the word as well as the 'meaning that the word[] ha[s] acquired when . . . used in case law.' " (Alterations in original.) *State v. Bertram*, 2023-Ohio-1456, ¶ 13, quoting *Rancho Cincinnati Rivers, L.L.C. v. Warren Cty. Bd. of Revision*, 2021-Ohio-2798, ¶ 21.

{¶ 29} Start with dictionaries. "Gerrymander" has been defined as "to divide (an area) into political units in an unnatural and unfair way with the purpose of giving special advantages to one group," *Webster's Third New International Dictionary* (2002), and more simply "[t]o manipulate in order to gain an unfair advantage," *The Oxford English Dictionary* (2d Ed. 1989). Under another definition, "gerrymandering" means "alter[ing] the boundaries of a constituency so as to favour one political party in an election." *Compact Oxford English Dictionary* (3d Ed., Rev. 2008). And under yet another definition, "gerrymandering" means "to divide (an area) into political units to give special advantages to one group." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2020). "Gerrymandering" has also been defined as "[t]he practice of dividing a geographical area into electoral districts, often of highly irregular shape, to give one political party an unfair advantage by diluting the opposition's voting strength," or "[t]he practice of dividing any geographical or jurisdictional area into political units (such as school

districts) to give some group a special advantage." *Black's Law Dictionary* (12th Ed. 2024).

{¶ 30} There are common threads in these definitions. First, the shape of the redrawn districts is usually irregular or unnatural. In other words, the district boundaries are often drawn in strange shapes by splitting natural communities of interest like counties, townships, and other political subdivisions. Second, the new districts tend to benefit some identifiable group. And third, the benefit to the identifiable group is often said to be unfair based on the irregular or unnatural shape of the districts. Taking all the definitions into consideration, an all-purpose definition of "gerrymander" is to draw district boundaries to give a political advantage to an identifiable group at the expense of neutral criteria such as geographic compactness, political subdivisions, or communities of interest.

{¶ 31} The United States Supreme Court has used the term in a variety of contexts that are consistent with this understanding. Thus, it has used the term "racial gerrymandering" when it has considered claims in which map drawers disregarded traditional redistricting criteria—such as compactness, contiguity, and communities of interest—to concentrate a dispersed racial-minority population into fewer districts. *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 27-28 (2023). It has used the term "partisan gerrymandering" in cases in which the same was done to political minorities. *See, e.g.*, *Rucho v. Common Cause*, 588 U.S. 684, 701-702 (2019). And most relevant here, it has used the term "bipartisan gerrymandering" to describe a process in which districts are drawn to produce state-wide electoral outcomes in proportion to statewide partisan preferences. *See Gill v. Whitford*, 585 U.S. 48, 61 (2018); *Davis v. Bandemer*, 478 U.S. 109, 154-155 (1986) (O'Connor, J., concurring in the judgment). It has also characterized this process of drawing districts to obtain preordained political outcomes such as proportionality as "reverse gerrymandering." *See Rucho* at 707-708; *Bandemer* at 159-160 (O'Connor, J., concurring in the judgment). S*ee also League of Women Voters of*

*Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-342, ¶ 115 (Kennedy and DeWine, JJ., dissenting) ("under today's decision, the commission must undertake a reverse-gerrymandering to guarantee Democratic victories to achieve exact proportional representation").

{¶ 32} The most relevant United States Supreme Court case is *Gaffney v. Cummings*, 412 U.S. 735 (1973), a case often cited for the proposition that states can engage in gerrymandering that does not violate the Constitution, *see, e.g.*, *Rucho* at 701. The redistricting plan in *Gaffney* "was drawn with the conscious intent to create a districting plan that would achieve a rough approximation of the statewide political strengths of the Democratic and Republican Parties." *Gaffney* at 752. While the Court held that the *Gaffney* plan was not an unconstitutional gerrymander, the Court has subsequently described the plan as a "bipartisan gerrymander." *Gill* at 61. Individual justices have also described the *Gaffney* plan as a bipartisan gerrymander. *Bandemer* at 153-154 (O'Connor, J., concurring in the judgment); *Vieth v. Jubelirer*, 541 U.S. 267, 351, fn. 6 (Souter, J., dissenting). In her concurrence in *Bandemer*, Justice Sandra Day O'Connor, joined by two other members of the Court, described the *Gaffney* map as a "bipartisan gerrymander," *Bandemer* at 154 (O'Connor, J., concurring in the judgment). She observed:

> A bipartisan gerrymander employs the same technique, and has the same effect on individual voters, as does a partisan gerrymander. In each instance, groups of individuals are assigned to districts with an eye towards promoting the ends of a political party and its incumbent legislators. Some groups within each party will lose any chance to elect a representative who belongs to their party, because they have been assigned to a district in which the opposing party holds an overwhelming advantage. Independent

> voters may lose any chance to influence the outcome of elections in their district, if one party has a sufficiently strong majority.

*Id.* To ensure greater proportionality to a minority party, she reasoned, is to engage in "reverse gerrymandering." *Id.* at 160.

{¶ 33} Under *Gaffney*, a two-party, proportional-representation redistricting model may not be unconstitutional. But it is gerrymandering. With this meaning in mind, we can now determine whether it is misleading to use that word in the ballot language.

{¶ 34} The proposed amendment's rules for drawing districts require that the statewide proportion of districts that favor Republicans and Democrats be within 3 percent of the proportion of the two-party vote that the Republicans and Democrats received in statewide general elections over the previous six years. Proposed Amendment at § 6(A) and (B). In other words, if over the last six years Republicans received 55 percent of the two-party vote in statewide general elections and Democrats received only 45 percent, the new commission would be required to draw the new districts so that anywhere from 52 percent to 58 percent favor Republicans. The proposed amendment allows the commission to attempt to comply with some traditional, neutral redistricting criteria "to the extent possible." *Id.* at § 6(C). But those criteria "do[] not permit adoption of a redistricting plan that violates" the political-proportionality requirements, under any circumstances. *Id.* In other words, if there is a choice between (1) drawing compact districts that maintain communities of interest or (2) achieving the statewide proportionality standard, the commission is *required* to opt for proportionality every time, no matter how irregularly shaped the resulting districts.

{¶ 35} What these rules require falls within the meaning of "gerrymander." They mandate the new commission draw district boundaries that give a political advantage to an identifiable group—Republicans in some districts and Democrats

in others. They require the commission to draw these partisan-advantaged districts at the expense of traditional, neutral redistricting criteria to overcome natural political geography and achieve proportional representation. These rules are not meaningfully different from those that produced the *Gaffney* plan. *See Gaffney*, 412 U.S. at 737-738. Because that was gerrymandering, *Gill*, 585 U.S. at 61, the requirements at issue here may fairly be called gerrymandering.

{¶ 36} The relators argue that our decision in *LWV*, 2022-Ohio-65, precludes the ballot board from using the word "gerrymander" to describe the current plan. The argument is that because the majority in *LWV* described the amendment as an "anti-gerrymandering amendment," it is misleading for the board to use the term "gerrymander" in describing the current plan. But this argument overlooks a key difference between the proposed plan and the existing constitutional provision that was at issue in *LWV*. Current law prescribes that the redistricting commission must "attempt" to draw a plan that does not "primarily . . . favor or disfavor a political party." Ohio Const., art. XI, § 6(A). It also provides that the commission must "attempt" to achieve a "statewide proportion of districts whose voters . . . favor each political party" in close correspondence "to the statewide preferences of the voters of Ohio." *Id.* at § 6(B). These two features are not, however, rigid requirements. *See LWV* at ¶ 88 (provisions of Article XI, Section 6(B) are "subordinate" to other map-drawing requirements specified in the Ohio Constitution).

{¶ 37} Now consider the proposed amendment. Unlike Article XI, Section 6, the standards of which need only be "attempt[ed]" to be met, the proposed amendment would assign paramount importance to proportionality, requiring that "the statewide proportion of districts in each redistricting plan that favors each political party shall correspond closely to the statewide partisan preferences of the voters of Ohio." Proposed Amendment at § 6(B). Thus, while current law allows consideration of political outcomes along with traditional redistricting criteria such

as compactness and keeping intact political subdivisions and communities of interest, the proposed amendment prioritizes partisan political outcomes above all else. These differences matter, thus rendering *LWV* inapt.

**{¶ 38}** Because the board's use of the term "gerrymander" is consistent with dictionary definitions and how the United States Supreme Court has used the term, it does not mislead, deceive, or defraud voters.

**{¶ 39}** For their second argument related to section two of the ballot language, relators contend that division (B) is misleading because, they say, it wrongly suggests that under current law, counties, townships and cities "cannot" be split across multiple districts and that preservation of communities of interest is a redistricting criterion of predominant interest. There is no dispute that under current law political subdivisions may be split. And the parties fail to cite anything in current law that requires the preservation of communities of interest. Even so, relators read too much into too little. This section of the ballot language does not address current law; rather, it describes the proposed amendment. And the description is accurate. First, the proposed amendment contemplates that it might not be possible to preserve the boundaries of a political subdivision, hence the amendment's use of the word "practicable," Proposed Amendment at § 6(C)(3). It follows that in saying that counties, townships, and cities "can" be split, the ballot language is not misleading. *See Merriam-Webster's Collegiate Dictionary* (11th Ed. 2020) (defining "can" as "indicat[ing] possibility"). Second, the proposed amendment establishes that the community-of-interest standard is subordinate to the proportionality criterion. Proposed Amendment at § 6(C). The ballot language accurately reflects this structure, calling the community-of-interest standard "secondary" to the proportionality criterion.

**{¶ 40}** We conclude that section two of the ballot language is not misleading.

### iii. Section three

{¶ 41} Relators next challenge section three of the ballot language, which relates to the composition of the proposed commission's members. Section three states that the proposed amendment would "[r]equire that a majority of the partisan commission members belong to the state's two largest political parties." Under the proposed amendment, the commission would be required to consist of 15 members: five members who are affiliated with the "First Major Party";[3] five members who are affiliated with the "Second Major Party";[4] and five members who are "independent."[5] Proposed Amendment at § 1(C)(1) through (3). The amendment provides that "[p]arty affiliation" shall be based on a commissioner's voting record in primaries and "various other relevant factors including, but not limited to, political contributions, campaign activities, and other reliable indicia of partisan affiliation." *Id.* at § 2(D)(2)(a).

{¶ 42} Relators claim that the ballot language is misleading because it conveys the false impression that the proposed amendment would constitutionalize partisan control of the new commission. Relators take issue with the word "belong to," observing that it does not appear in the language of the amendment. They say that "belong" connotes membership in a political party, contrasting with the amendment's definition of "[p]arty affiliation," which they argue bears a more flexible meaning.

3. The proposed amendment defines the term "First Major Party" as "the political party whose candidate for governor received the highest number of votes in the last election held for such office." Proposed Amendment at § 11(C).

4. The proposed amendment defines the term "Second Major Party" as "the political party whose candidate for governor received the second highest number of votes in the last election held for such office." Proposed Amendment at § 11(D).

5. The proposed amendment defines the term "Independent" as a "person who is not affiliated with either the First Major Party or the Second Major Party as determined by the bipartisan screening panel." Proposed Amendment at § 11(B).

**{¶ 43}** In reviewing ballot language, this court will not "pars[e] minute differences in connotation," leaving choices between words of the same meaning to the officials chosen to make those choices. *One Person One Vote*, 2023-Ohio-1928, at ¶ 29. Ohio law provides that "[f]or purposes of signing or circulating a petition of candidacy for party nomination or election, an elector is considered to be a member of a political party if the elector voted in that party's primary election within the preceding two calendar years, or if the elector did not vote in any other party's primary election within the preceding two calendar years." R.C. 3513.05; *see also* R.C. 3513.19(A)(3) (using R.C. 3513.05's criteria to determine a person's eligibility to vote in a primary election). And here, part of the proposed amendment's definition of "party affiliation" accounts for a would-be commissioner's voting record in party primaries. *See* Proposed Amendment at § 2(D)(2). The amendment can thus fairly be said to incorporate standards that Ohio uses to determine political-party membership. Beyond this, the definition of "party affiliation" under the proposed amendment refers to "other indicia of partisan affiliation," *id.* at § 2(D)(2)(a). To "affiliate" is to "associate as a member." *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2020). Thus, once again, the amendment speaks to membership in a political party as a mark of determining "party affiliation." We do not second guess the ballot board's choice of wording in using the term "belong to." *See One Person One Vote* at ¶ 29. It is factually accurate and the subject is addressed by the proposed amendment. Therefore, it is not misleading.

**{¶ 44}** Relators next argue that the ballot language is misleading because it fails to identify the proposed amendment's six conflict-of-interest provisions, one of which prohibits current elected officials from serving on the new commission, *see* Proposed Amendment at § 3(C)(1). But while including this information may have made the ballot language more complete, it would have come at the cost of concision. *See Jurcisin v. Cuyahoga Cty. Bd. of Elections*, 35 Ohio St.3d 137, 142

21

(1988) ("Additional language may have made the summary more complete as to some aspects of the charter amendment, but would also have defeated the purpose of the summary in providing a clear, concise description of the amendment to the voters."). Moreover, the ballot title itself, which appears above the ballot language, states that the commission will be composed of persons who are "not elected," and one of the overarching goals of the committee is to remove politicians from the redistricting process. Relators can hardly fault the ballot language given that it contains a title that accurately conveys the proposed amendment's goal. This omission is therefore not material.

**{¶ 45}** For their third argument, relators fault the ballot language for allegedly failing to identify how many commissioners there will be from each affiliation category and the voting requirements to pass a plan. Here, section six of the ballot language—which relators do not challenge—describes the proposed amendment as requiring that the new commission be composed of 15 members and as specifying that five shall be from the first major political party, five shall be from the second major political party, and five shall be from neither of those two parties.[6] Although the ballot language does not use the word "independent" to describe the third category of members, the description of the commission's composition under the proposed amendment is substantively accurate, and this court leaves matters of wordsmithing to the ballot board, *see One Person One Vote*, 2023-Ohio-1928, at ¶ 29.

**{¶ 46}** Section seven of the ballot language, which relators also do not challenge, accurately specifies that the affirmative votes of 9 of 15 members would be required to pass a redistricting plan. Although section seven does not say that two of those votes would be required to come from independents, *see* Proposed

---

6. Section six refers to the batch-selection process, by which six members would be chose first and then nine more members would be chosen later—15 total members.

Amendment at § 4(A), and while inclusion of that information may have been helpful, that omission is immaterial and does not create a defect in the ballot language. By conveying that the votes of at least nine commission members are required to adopt a plan, the ballot language tells the average voter that no five-member commissioner bloc (first major party, second major party, or independent) would be able to dominate the proposed commission.

{¶ 47} Last, relators claim that the ballot language is deceptive because it fails to specify that the proposed amendment would require the commissioners to serve with impartiality, integrity, and fairness, *see id.* at § 1(C). To accept this argument would be to presume that voters do not know that persons who sit on government commissions are expected to conduct the public's business with impartiality, integrity, and fairness. It was not incumbent on the ballot board to tell the voters what they already know to be true. This omission is not material.

{¶ 48} We conclude that section three of the ballot language is not defective.

### iv. Section four

{¶ 49} Relators next challenge section four of the ballot language, which describes the proposed amendment's method of removing a commissioner. Section four states that the proposed amendment would "[p]revent a commission member from being removed, except by a vote of their fellow commission members, even for incapacity, willful neglect of duty or gross misconduct." The proposed amendment provides that "a commissioner shall be removed only by the commission and only for cause after notice, a public hearing," and an opportunity for public input. Proposed Amendment at § 4(C). Instances of "cause" include "willful neglect of duty," "gross misconduct" in office, and incapacity. *Id.* at § 4(C)(3) through (4).

{¶ 50} Relators posit that the ballot language is misleading because it inserts the word "prevent"—a word not included in the proposed amendment—

thereby connoting that under the amendment, a commission member would be insulated from removal for disqualifying conduct.

{¶ 51} As an initial matter, the ballot board retains discretion to use words that do not appear in the proposed amendment. *See State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections*, 2013-Ohio-4489, ¶ 52 ("A strict requirement that boards cannot draft ballot language using nouns or verbs that do not appear in the proposed amendment would unduly restrict a board's discretion as it carries out its duties."). Standing alone, then, the ballot board's decision to use the word "prevent" is not enough to invalidate the ballot language. Beyond this, the question is not "whether the members of this court might have used different words to describe the language used in the proposed amendment, but, rather, whether the language adopted by the ballot board properly describes the proposed amendment." *State ex rel. Bailey v. Celebrezze*, 67 Ohio St.2d 516, 519 (1981). Relators do not make a convincing case that the ballot board's description is defective. As proposed, the amendment would vest the new commission with the sole power to remove one of its members, authorizing removal in instances of willful neglect of duty, gross misconduct in office, or incapacity. The ballot language is factually accurate and describes this procedure, albeit in its own words.

{¶ 52} Relators also argue that the ballot language is defective because, under current law, there is no way to remove a member of the Ohio Redistricting Commission. Although it is true that Article XI, Section 1 of the Ohio Constitution does not prescribe a removal procedure, this does not expose a flaw in the ballot language. This court has "never held that ballot language must inform voters about current law." *One Person One Vote*, 2023-Ohio-1928, at ¶ 10. Here, the ballot board's omission about current law is not material.

{¶ 53} We conclude that section four of the ballot language is not misleading.

### v. Section five

{¶ 54} Relators next challenge section five of the ballot language, which relates to the scope of judicial review that the proposed amendment would authorize. Section five states that the proposed amendment would "[p]rohibit any citizen from filing a lawsuit challenging a redistricting plan in any court, except if the lawsuit challenges the proportionality standard applied by the commission, and then only before the Ohio Supreme Court." The proposed amendment provides that "[t]he Supreme Court of Ohio shall have exclusive, original jurisdiction in all cases which contend that a redistricting plan adopted by the commission fails to comply with the requirements of section 6(B) of this article." Proposed Amendment at § 8(A). It further provides that "[e]xcept for claims brought under [section 8], no other challenges to an adopted final redistricting plan, including challenges to the decisions of the commission with respect to how best to comply with the criteria in section 6(C), may be brought in any court." *Id.* at § 8(F).

{¶ 55} Relators argue that the ballot language is flawed because, contrary to the Supremacy Clause of the United States Constitution, it purports to exclude the availability of judicial review in federal court as authorized by federal law. The Supremacy Clause provides that federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. "By this declaration, the states are prohibited from passing any acts which shall be repugnant to a law of the United States." *McCulloch v. Maryland*, 17 U.S. 316, 361 (1819). When it comes to regulating the jurisdiction of the federal courts, federal law is supreme—that is, the federal courts exercise jurisdiction as authorized by the United States Constitution and federal statutes. *See Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986).

{¶ 56} Even though the State of Ohio cannot exclude the availability of federal judicial review on matters of federal law, a point that the ballot board does

not contest, relators misconceive what the ballot language is supposed to convey. The ballot language must properly describe the proposed amendment, *State ex rel. Bailey v. Celebrezze*, 67 Ohio St.2d 516, 519 (1981), not the effects of the amendment on the availability of federal-court review. And here, the proposed amendment expressly says that "[t]he Supreme Court of Ohio shall have exclusive, original jurisdiction" in redistricting-related cases in which a contention arises that a redistricting plan "fails to comply with the requirements of section 6(B) of [the proposed amendment]," Proposed Amendment at § 8(A), and that no challenges to changes made by special masters or challenges to an adopted final redistricting plan may be brought in "any court," *id.* at § 8(D)(4) and (F). It follows that the ballot board did not err in using the phrase "any court" in crafting the ballot language, because that term comes from the proposed amendment itself.

{¶ 57} Relators next argue that the ballot language is false in saying that this court could exercise its jurisdiction under the terms of the proposed amendment only if the challenge invokes a "proportionality standard." They say that our jurisdiction is not so limited, noting that we would have jurisdiction over cases that involve the requirements of Section 6(B) of the proposed amendment and that some of the requirements under Section 6(B) do not involve proportionality, such as requirements pertaining to an incumbent elected official's residence (subsection 6(B)(4)) and the expiration of certain senators' terms (subsection 6(B)(5)). We agree. Although subsections 6(B)(4) and 6(B)(5) fall under a section of the proposed amendment that would prescribe a proportionality standard, these two subsections have no meaningful relationship to that standard. By using the term "proportionality standard," the ballot language thus falsely suggests that the scope of this court's review would not extend to the portions of the proposed amendment that address incumbent elected officials' residences and the expiration of certain senators' terms. It is inaccurate and therefore defective.

{¶ 58} We conclude that section five of the ballot language is defective insofar as it states that a challenge may be filed based only on the "proportionality standard."

### vi. Section eight

{¶ 59} Relators next challenge section eight of the ballot language, which relates to communications between the public and the proposed redistricting commission. Section eight provides that the proposed amendment would "[l]imit the right of Ohio citizens to freely express their opinions to members of the commission or to commission staff regarding the redistricting process or proposed redistricting plans." By way of background, under current law, the redistricting commission is required to hold public meetings and public hearings, *see* Ohio Const., art. XI, § 1(C), and there is no dispute that the commission makes an online portal available for public comment.

{¶ 60} Under the proposed amendment, the new redistricting commission would be required to "conduct its hearings in a manner that invites broad public participation throughout the state, including by using technology to broadcast commission meetings and to facilitate meaningful participation from a range of Ohioans." Proposed Amendment at § 5(A). To this end, the commission would be required to "adhere to all applicable public records and open meetings laws," *id.* at § 5(A)(1), "hold at least three rounds of public meetings" before adopting a redistricting plan," *id.* at § 5(B), "hold at least five initial input hearings to gather information from the public . . . [to] inform the commission's creation of redistricting plans," *id.* at § 5(B)(1), "hold at least five hearings" following the release of draft redistricting plans to gather comments, *id.* at § 5(B)(2), "hold at least two hearings to gather comments on any such plans" if revisions are made to draft redistricting plans, *id.* at § 5(B)(3), and "provide a portal for digital submission of public comments," *id.* at § 5(C).

{¶ 61} On the other hand, the proposed amendment would prohibit the commissioners and commission staff, professionals, and consultants from "communicat[ing] with any outside person about the redistricting process or redistricting plan outcomes other than through designated public meetings or official commission portals." *Id.* at § 5(A)(2). Likewise, the proposed amendment would prohibit any person from "attempt[ing] to contact any member or members of the commission or commission staff, professional, or consultants with the intent to influence the redistricting process or redistricting plan outcomes other than through designated public meetings or official commission portals." *Id.* at § 5(A)(3).

{¶ 62} Distilled, the proposed amendment would provide rights of public participation in the redistricting process through meetings, hearings, and an online public portal and would forbid communication with the commission members and staff outside the public-meeting and portal context. The ballot language is accurate in providing that it would "limit" the public's ability to freely express their opinions to members of the new redistricting commission. Under the proposed amendment, citizens could not write letters to commission members, could not approach commission members in public places to discuss redistricting plans, and would even seem to be forbidden from purchasing radio or television advertisements designed to communicate their views to commission members.[7] But the ballot language focuses solely on the prohibition against communicating with the commission without advising the voter of the proposed amendment's public-hearing provisions.

{¶ 63} It is to be expected that ballot language will trim immaterial portions from a proposed amendment. *See Cincinnati Action for Hous. Now*, 2021-Ohio-

---

7. We express no opinion here about whether such restrictions would survive constitutional muster under the First Amendment to the United States Constitution no about the apparent inconsistency of such requirements with the terms of Article I, Section 11 of the Ohio Constitution.

1038, at ¶ 33, quoting *Cincinnati for Pension Reform*, 2013-Ohio-4489, at ¶ 75 ("The nature of a summary requires the omission of 'some important but nonessential information."). And this court has previously held that it is permissible for ballot language to omit provisions concerning an open redistricting process (e.g., holding open meetings and providing opportunities for public comment). *See Voters First*, 2012-Ohio-4149, at ¶ 5, 44. But in *Voters First*, the ballot language declined to address the topic at all, whereas here, the ballot language addresses the topic but does so incompletely, omitting substantive features concerning the public's right to communicate with the proposed redistricting commission through such procedures as public meetings and hearings. If "the ballot board approves a condensed text of the proposed constitutional amendment, any omitted substance of the proposal must not be material." *Id.* at ¶ 30. By leaving unsaid what the proposed amendment would do to preserve rights of public participation through such procedures as public meetings and hearings, we conclude that the ballot board drifted into argumentation. *See Bailey*, 67 Ohio St.2d at 519 ("effective arguments can be made [in proposed ballot language] as easily by what is said as by what is left unsaid, or implied").

{¶ 64} The ballot board responds that the ballot language's failure to describe rights of public participation is not objectionable, because, under current law, the public has rights of public participation. Thus, the ballot board says, without citation to authority, that it was acceptable for its language to focus on what was new about the proposed amendment. But the proposed amendment includes additional public meetings and hearings than those found in current law. Under current law pertaining to state-legislative maps, the redistricting commission must hold at least three public hearings, Ohio Const., art. XI, § 1(C), and under current law pertaining to congressional maps, the commission must hold at least two public hearings, Ohio Const., art. XIX, § 1(G). The proposed amendment, on the other hand, contemplates at least three rounds of public meetings, Proposed Amendment

at § 5(B), and ten public hearings, *id.* at § 5(B)(1) through (2), with the possibility of two more hearings, *id.* at § 5(B)(3).

{¶ 65} We conclude that section eight of the ballot language is defective because it fails to address rights of public participation.

### vii. Section nine

{¶ 66} Relators next challenge section nine of the ballot language, which pertains to the proposed amendment's requirement that new state legislative and congressional districts be created. Section nine states that the proposed amendment would "require the commission to immediately create new legislative and congressional districts in 2025 to replace the most recent districts adopted by the citizens of Ohio through their elected representatives." The proposed amendment provides that "[u]pon the effective date of this article, all redistricting plans used to elect members of the general assembly or the United States House of Representatives are void for any subsequent election." Proposed Amendment at § 10(A). It further provides that "[n]o later than September 19, 2025, and no later than July 15 of every year ending in one, the commission shall adopt final redistricting plans." *Id.* at § 5(B)(4).

{¶ 67} Relators claim that the ballot language is misleading because it conveys the false impression that the most recent set of district maps was adopted by the voters themselves. They point out that Ohio citizens do not have a vote on the redistricting commission and that some Ohio citizens were unable to cast a vote for the majority of the commission's members. *See* Ohio Const., art. XI, § 1 (specifying the commission's composition).

{¶ 68} Relators overlook that the ballot language describes the citizens as manifesting their will "through their elected representatives." That phrase is readily understood, conveying the idea that in a representative democracy, "the people elect representatives to make law and policy decisions for them," *Black's Law Dictionary* (10th Ed. 2014) (defining "representative democracy"). Indeed, relators

do not contend that the members of the redistricting commission who presided over the recent redistricting process were not (or are not) all elected representatives. The fact that all Ohio voters did not get to vote in the elections of all the General Assembly members who sat on the commission does not diminish the fact that those members were (or are) elected representatives.

{¶ 69} We conclude that section nine of the ballot language is factually accurate and is not misleading.

### viii. Section ten

{¶ 70} Relators next challenge section ten of the ballot language, which addresses the proposed amendment's costs. Section ten states that the proposed amendment would "[i]mpose new taxpayer-funded costs on the State of Ohio to pay the commission members, the commission staff and appointed special masters, professionals, and private consultants" hired by the new redistricting commission. Section ten also says that the State would be required to pay "an unlimited amount for legal expenses" that the commission incurs.

{¶ 71} The proposed amendment provides that the new redistricting commission shall be funded through "appropriat[ions] by the general assembly." Proposed Amendment at § 9(B)(1)(a). In 2025, the amount appropriated would be required to be "not less than seven million dollars," *id.*, and in subsequent years, the amount shall be "not less than the amount appropriated [for 2025], adjusted for inflation," *id.* at § 9(B)(1)(b). Members of the screening panel and the commission would be entitled to a per diem. *Id.* at § 2(C) and 9(A). Special masters would be entitled to compensation. *Id.* at § 9(C). The commission would be authorized to retain staff (including an executive director), professionals, and consultants. *Id.* at § 4(E). A professional search firm selected from a request-for-proposal process would be required to assist in soliciting applications for commissioner positions. *Id.* at § 2(D)(1)(a). And the General Assembly would be required to make

appropriations to "cover all the commission's expenses in any related litigation." *Id.* at § 9(B)(1)(c).

{¶ 72} In relators' view, the ballot language is misleading in light of current constitutional provisions requiring that the General Assembly make "the appropriations it determines necessary" to enable the redistricting commission to perform its duties, Ohio Const., art. XI, § 1(D), and requiring the commission to have the power to "[h]ire staff" and "[e]xpend funds," *id.* at § 1(B)(2)(a)(ii) through (iii). Relators also observe that the commission incurred more than a million dollars in legal fees in past litigation in defending maps it drew. Because the proposed amendment would do no more than preserve prevailing practices, the argument runs, it is misleading for the ballot language to suggest that the proposed amendment would do something different.

{¶ 73} Section ten of the ballot language is not misleading. It is factually accurate. By its terms, the proposed amendment will require new taxpayer funding to enable the new redistricting commission to perform its duties. While it is true that current law contemplates the hiring of staff and expenditure of funds for the commission, relators do not dispute that the proposed amendment would introduce several new features not found in current law: establishing per diems for commission members, paying special masters, hiring an executive director on staff, and contracting with a professional search firm. These features have costs that the taxpayers would need to pay for, just as the ballot language provides.

{¶ 74} Finally, section ten's characterization of the proposed amendment as authorizing coverage for "an unlimited amount [of] legal expenses" is not objectionable, given that the amendment provides for coverage of "all" the new redistricting commission's litigation-related legal expenses, Proposed Amendment at § 9(B)(1)(c). As we have said, "'all' means all." *Watkins v. Dept. of Youth Servs.*, 2015-Ohio-1776, ¶ 16.

{¶ 75} We conclude that section ten of the ballot language is not misleading.

**ix. Limited writ**

{¶ 76} Relators argue that they are entitled to the writ they request because the ballot language has defects that, as a whole, violate the constitutional standard in their cumulative effect. *See One Person One Vote*, 2023-Ohio-1928, at ¶ 8 ("If there are defects in ballot language, we examine the defects as a whole and determine whether their cumulative effect violates the constitutional standard."). The above analysis establishes that section five of the ballot language is misleading insofar as it refers to a "proportionality standard" and that section eight of the ballot language is misleading because it fails to identify that the public has rights to participate in the redistricting process. The cumulative effect of these defects will "mislead, deceive, or defraud the voters," Ohio Const., art. XVI, § 1. Because the cumulative effect of these defects violates the constitutional standard, we grant a limited writ of mandamus ordering the ballot board and the secretary of state to reconvene forthwith and adopt ballot language that remedies these defects. *See Ohioans United for Reproductive Rights*, 2023-Ohio-3325, at ¶ 48-49 (lead opinion) (directing the secretary and the ballot board to reconvene "forthwith" and adopt accurate ballot language).

{¶ 77} We reject relators' request that we mandate the ballot board prescribe specific language. "Nothing in Article XVI, Section 1 or any other constitutional provision authorizes this court to sit as a super ballot board to prescribe ballot language for a proposed constitutional amendment after we have determined that the language prescribed by the board is invalid." *Voters First*, 2012-Ohio-4149, at ¶ 62 (O'Connor, C.J., concurring).

**2. *The ballot title***

{¶ 78} We now turn to relators' challenge to the ballot title. Ohio law provides that the ballot title "shall give a true and impartial statement of the measures in such language that the ballot title shall not be likely to create prejudice for or against the measure." R.C. 3519.21. This court has construed this language

as calling for an "examin[ation] whether the ballot title tells voters what they are being asked to vote on and whether it impermissibly uses language that amounts to persuasive argument," *One Person One Vote* at ¶ 24, which is the same standard applicable to the examination of ballot language, *see id.* at ¶ 8.

**{¶ 79}** The ballot title that the secretary adopted states that the proposed amendment would "create an appointed redistricting commission not elected by or subject to removal by the voters of the state." Relators argue that the title is inaccurate and prejudicial against the amendment. The crux of their argument is that the ballot title wrongly suggests that the proposed commission would not have democratic legitimacy. This argument fails.

**{¶ 80}** The ballot title tells the voters, in condensed form, what they are being asked to vote on, and nothing in it is factually inaccurate because Ohio voters do not get a vote in the process of selecting or removing members of the proposed redistricting commission. Under the proposed amendment, the first batch of members of the commission would gain their seats by way of a screening panel, Proposed Amendment at § 2(D)(7), and the second batch would gain their seats from a selection process controlled by the first-batch commission members, *id.* at § 2(D)(8). By the same token, nothing in the proposed amendment would permit the voters to remove a commissioner once he or she has gained a seat. As noted above, "[a] commissioner shall be removed only by the commission." *Id.* at § 4(C).

**{¶ 81}** Relators go on to fault the ballot title for ignoring how the members of the proposed redistricting commission would be selected and removed under the proposed amendment. But that argument asks for too much from the secretary. If, as is true under the caselaw, the ballot board has discretion to paraphrase in concise language the words of a proposed amendment in crafting the ballot language, *see State ex rel. Rhoads v. Hamilton Cty. Bd. of Elections*, 2021-Ohio-3209, ¶ 34, then the secretary has even stronger grounds for doing so in drafting the ballot title.

Adopting relators' argument would risk turning the ballot title into a ballot summary.

{¶ 82} We conclude that the secretary did not err in crafting the ballot title.

### III.  CONCLUSION

{¶ 83} We grant a limited writ of mandamus ordering Secretary of State LaRose and the Ohio Ballot Board to reconvene forthwith and adopt ballot language that accurately conveys that (1) judicial review under section eight of the proposed amendment is not limited to a "proportionality standard" and (2) the public would have the right to express itself to the new redistricting commission under the terms of section five of the proposed amendment.  The writ is denied in all other respects.  The motion for leave to withdraw the answer is granted, and the motion to strike is denied as moot.

Writ granted in part
and denied in part.

_____

**FISCHER, J., concurring.**

{¶ 84} I generally and fully agree with the analysis of the per curiam opinion, and I write separately to make one point clearer.  I write regarding the portion of section two of the ballot language specifying that the proposed Ohio Citizens Redistricting Commission would be "required" to gerrymander district boundaries under the proposed constitutional amendment.

### Standard of Review

{¶ 85} As noted in the per curiam opinion, in this case we must determine whether the language adopted by respondents, Ohio Ballot Board and its members,[8] is written in a manner so as to "'mislead, deceive, or defraud the voters.'"  Per

_____

8. The individual members of the ballot board are respondents Secretary of State Frank LaRose (also the chair of the board), Senator Theresa Gavarone, Senator Paula Hicks-Hudson, William Morgan, and Representative Terrence Upchurch.

curiam opinion, ¶ 14, quoting Ohio Const., art. XVI, § 1.  I additionally note that relators[9] must prove their case by clear and convincing evidence.  *State ex rel. Ohioans United for Reproductive Rights v. Ohio Ballot Bd.*, 2023-Ohio-3325, ¶ 10, citing *State ex rel. Waters v. Spaeth*, 2012-Ohio-69, ¶ 13.  Relators have failed to do so here.

## Use of the word "required" in section two of the ballot language is not an abuse of discretion

{¶ 86} Section two of the ballot language provides that the proposed amendment would "[e]stablish a new taxpayer-funded commission of appointees *required* to gerrymander the boundaries of state legislative and congressional districts to favor the two largest political parties in the state of Ohio."  (Emphasis added.)  I agree that under the common definitions of "gerrymandering" noted in the per curiam opinion, *see* per curiam opinion at ¶ 29, and especially under Justice Sandra Day O'Connor's description of a "bipartisan gerrymander" in *Davis v. Bandemer*, 478 U.S. 109, 154-155 (1986) (O'Connor, J., concurring in the judgment), the drawing of district boundaries under the proposed amendment would always require some form of gerrymandering.

{¶ 87} Notably, however, the ballot language states unequivocally that gerrymandering would be "required" under the amendment.  And at first blush, and when examining the textual language alone, it is uncontested that the proposed amendment would not explicitly "require" gerrymandering.  Thus, for the ballot language to be accurate, the proposed Ohio Citizens Redistricting Commission would necessarily have to engage in gerrymandering in every conceivable instance.  Initially, this does not seem to be true, for at least two reasons.

---

9. The relators in this case are Citizens Not Politicians and two Ohio resident-electors, Cara Dillon and Annette Tucker Sutherland.

{¶ 88} First, there could be scenarios in which the political preferences of Ohioans and the state's political geography might align in a manner such that no manipulation to favor or disfavor one or more political parties would have to be conducted because the redistricting plan adopted by the commission naturally corresponds closely to the statewide partisan preferences of Ohioans. Such a scenario may be highly unlikely—but at first glance, it is at least conceivable that the redistricting process set out in the proposed amendment could result in a plan that was drawn without any gerrymandering having occurred. But that is not what "required" is really about here.

{¶ 89} Second, the proposed amendment envisions that it may be impossible to create a plan that corresponds closely to Ohioans' political preferences. Section 6(B)(3) of the proposed amendment provides that it may be "arithmetically impossible" for a plan to deviate by no more than 3 percentage points from the "statewide partisan preferences" of Ohio voters. In such instances, the proposed amendment provides that the adopted plan may deviate from those partisan preferences "by the smallest possible proportion that is larger than three percentage points." *Id.* It is possible that the political geography of Ohio could be such that it would be necessary for a plan to deviate far more than 3 percentage points in order to contain contiguous districts that comply with the United States Constitution and applicable federal laws, as mandated by § 6(A) of the proposed amendment, and yet in deviating that far from the 3 percentage-point requirement, the redistricting plan ultimately adopted will supposedly have resulted without direct manipulation to favor or disfavor one or more political parties. But again, this is not what "required" is really about.

{¶ 90} Such scenarios may be unlikely to occur, but they are possible. And because they are possible, at first examination it seems inaccurate to say unequivocally that the proposed amendment would "require" gerrymandering in every instance. Although gerrymandering *may* be required in almost all instances,

under an intense, narrowly focused textual analysis of the word "required," it would not necessarily be *required* in every conceivable instance. That, however, is such a narrow view that it does not take into account the goal of the entire proposed amendment, i.e., the 'tree' is hiding the whole 'forest' from view.

### What "required" really means

{¶ 91} Looking at the proposed amendment as a whole, however, undermines that limited assessment. Section 6 of the proposed amendment mandates bipartisan gerrymandering by the new commission to ensure that two political parties get their representation, albeit in proportion to recent statewide voting. *See* Proposed Amendment at § 6(B). In effect, the proposed amendment mandates that partisan analysis and the drawing of various two-party district lines become state constitutional requirements. So gerrymandering, though in a bipartisan manner, is absolutely "required" under the proposed amendment. And if you are an independent voter, or a member of the Libertarian or similar third parties, your state constitution would dictate that your voice is removed from Ohio's political world via a bipartisan gerrymander, thereby undermining the concept of "one person, one vote."

### Conclusion

{¶ 92} For the above-stated reasons, I heartily agree with the analysis of the per curiam opinion and concur in the court's judgment.

———————————

**DONNELLY, J., joined by STEWART, J., concurring in part and dissenting in part.**

{¶ 93} The proponents of the proposed constitutional amendment in Issue 1 believe that the foxes are guarding the henhouse, so they want a changing of the guard. Respondents, Secretary of State Frank LaRose and the Ohio Ballot Board,[10]

———————————

10. The individual members of the ballot board are respondents Secretary of State Frank LaRose (also the chair of the board), Senator Theresa Gavarone, Senator Paula Hicks-Hudson, William

have chosen ballot language that tells Ohio voters that the amendment would burn down the henhouse. I concur in the majority opinion to the extent that it orders the board to make a couple of minor corrections to the ballot language, though I vehemently disagree that those corrections are even remotely adequate to prevent the ballot language as a whole from being misleading, and I join Justice Brunner's concurring-and-dissenting opinion in full.

{¶ 94} Respondents argue that there is nothing misleading about ballot language portraying the proposed amendment as removing "constitutional protections against gerrymandering approved by nearly three quarters of Ohio electors participating in the statewide elections of 2015 and 2018," because that statement is factually accurate and because " 'recent events' " could be " 'relevant' " to an understanding of the amendment. Respondents' brief at 10, quoting *State ex rel. One Person One Vote v. Ohio Ballot Bd.*, 2023-Ohio-1928, ¶ 13. In the spirit of respondents' argument, I offer a few more factually accurate tidbits of my own.

{¶ 95} In 2021 and 2022, members of the Ohio Redistricting Commission—which included Secretary of State Frank LaRose and Governor Mike DeWine[11]—repeatedly and intentionally refused to follow the mandates of this court when we enforced Articles XI and XIX of the Ohio Constitution to strike down their gerrymandered General Assembly and congressional-district maps. *See*

---

Morgan, and Representative Terrence Upchurch. Senator Hicks-Hudson and Representative Upchurch opposed the adoption of the ballot language.

2. To be fair, Governor DeWine and Secretary LaRose have taken a variety of positions regarding the district-map litigation in 2022 and Articles XI and XIX of the Ohio Constitution. For example, Secretary LaRose indicated that he voted in favor of Senate President Matt Huffman's redistricting map despite its being unfair, and he described Huffman's official statement justifying the map as "'asinine,'" before adding that it was the "'second asinine thing I'm voting for tonight.'" *League of Women Voters of Ohio*, 2022-Ohio-65, at ¶ 52. Governor DeWine later admitted that the redistricting debacle in 2022 "didn't work, and we need to fix it," adding that "[t]aking it out of the hands, frankly, of elected officials is probably a good idea." *Gov. DeWine says it's time to take redistricting process away from elected officials*, Toledo Blade (Feb. 15, 2023), available at https://www.toledoblade.com/local/politics/2023/02/15/dewine-redistricting-process-elected-officials/stories/20230215128 (accessed Sept. 15, 2024) [https://perma.cc/X5Z4-T56W].

*League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65; *Adams v. DeWine*, 2022-Ohio-89; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-342; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-789; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-1235; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-1727; *Neiman v. LaRose*, 2022-Ohio-2471.  The three justices who dissented from our 2022 judgments—who are now in the majority today—believed that the maps proposed by the redistricting commission were perfectly acceptable.  *See, e.g.*, *Adams* at ¶ 107-219 (Kennedy, Fischer, and DeWine, JJ., jointly dissenting).  Subsequent to these decisions, Governor DeWine appointed Justice Deters to this court.  *See* Bischoff, *Gov. Mike DeWine picks Joe Deters for Ohio Supreme Court opening*, Cincinnati Enquirer (Dec. 22, 2022) https://www.cincinnati.com/story/news/politics/elections/2022/12/22/gov-mike-dewine-picks-joe-deters-for-ohio-supreme-court-opening/69715432007/ (accessed Sept. 15, 2024) [https://perma.cc/6635-TTXB].

{¶ 96} The proposed constitutional amendment currently at issue states that it would "ban partisan gerrymandering" and ban using statewide district maps that "favor one political party and disfavor others," by requiring that the districts as a whole "correspond closely to the statewide partisan preferences of the voters of Ohio."  Proposed Amendment § 6(B).  Now Secretary LaRose is wearing the hat of Chairman of the Ohio Ballot Board instead of the hat of a member of the Ohio Redistricting Commission that was repeatedly held to have violated Articles XI and XIX of the Ohio Constitution.  Secretary LaRose proposed ballot language to the ballot board that touts Articles XI and XIX of the Ohio Constitution as laudable "constitutional protections against gerrymandering" and the proposed amendment as destroying those protections in favor of "partisan outcomes."  The final version of the ballot language states that under the proposed amendment—which itself states that it would ban partisan gerrymandering and unfair partisan outcomes by

prioritizing proportionality—gerrymandering is "required." Chief Justice Kennedy and Justices DeWine and Fischer, now joined by Justice Deters, agree that it is perfectly fine to describe a proposed constitutional amendment to *prohibit* gerrymandering as *requiring* gerrymandering. Majority opinion, ¶ 23-35; *see also* concurring opinion, ¶ 91.

{¶ 97} One might say that I have presented a set of factually accurate information that is relevant to the dispute given the history of redistricting in Ohio and the particular parties involved. On the other hand, one might say that my information, while technically accurate, attempts to persuade readers to draw a negative conclusion about the substance of the majority's view. I agree with the latter, just as the majority should agree that the ballot language attempts to persuade voters to vote against the proposed amendment.

{¶ 98} Ballot language that "is '"in the nature of a persuasive argument in favor of or against the issue . . ."'" is prohibited." (Ellipsis added in *Bailey*.) *State ex rel. Bailey v. Celebrezze*, 67 Ohio St.2d 516, 519 (1981), quoting *Beck v. Cincinnati*, 162 Ohio St. 473, 474-475 (1955). Argument against a proposed amendment is not allowed in ballot language because, among other reasons, Article XVI, Section 1 of the Ohio Constitution draws clear divides among (1) "arguments for and . . . against a proposed amendment," (2) language that is "an explanation of the proposal, which may include its purpose and effects," and (3) the ballot language itself, which must "properly identify the substance of the proposal." Respondents have completely failed to respect the constitutionally required division between ballot language for a proposed constitutional amendment and argumentation against the proposed amendment.

{¶ 99} The majority spends a large portion of its analysis determining that particular bits of language in the ballot language—viewed in isolation—can be seen as factually accurate and that it would not be misleading for particular bits of language—viewed in isolation—to be added to or omitted from the ballot language.

But whether ballot language could be interpreted as factually accurate does not tell us whether the language is a persuasive argument, nor does the inclusion or exclusion of one particular detail about a proposed amendment tell us whether the ballot language as a whole constitutes impermissible argumentation. We have made clear that "arguments can be made [in ballot language] as easily by what is said as by what is left unsaid, or implied." *Bailey* at 520.

{¶ 100} The majority sidesteps the need to consider what is implied by the ballot language as a whole by largely failing to address the relationship between what is "said" and what is "left unsaid" in each paragraph of the ballot language—individually and collectively. Justice Brunner's well-reasoned dissenting opinion breaks down the problems with the majority's analysis at the paragraph level, so I need not belabor the finer points. However, I do wish to point out the larger problem with the majority's treatment of key terms such as "gerrymandering" and "partisan political outcomes," majority opinion at ¶ 27-29, 37, and concepts such as "hold[ing] . . . representatives accountable" regarding gerrymandering, *id.* at ¶ 19. The majority extracts these terms and concepts, divorces them from all context, assigns whatever meaning it finds most acceptable, and shoves each one back into its original context to allow for ballot language that is clearly contrary to both the letter and the spirit of the proposed amendment. This kind of interpretive mischief might be excusable for someone like Amelia Bedelia[12] but not for a state court of last resort.

{¶ 101} Chief Justice John Roberts of the United States Supreme Court famously distilled the notion of impartiality down to the role of an umpire in

---

3. Amelia Bedelia is the main character in a children's-book series about a maid who causes chaos when she follows her employer's instructions by interpreting ambiguous terms in ways clearly not intended by the employer, such as trimming the fat on a steak by decorating it with bows, Peggy Parish, *Amelia Bedelia* 38-41, 56-57 (1963) (republished by HarperCollins, 1992), and trimming a Christmas tree by cutting off its branches, Peggy Parish, *Merry Christmas, Amelia Bedelia* 36-37 (1986).

America's favorite pastime—baseball—whose job it is "to call balls and strikes." *Chief Justice Roberts Statement – Nomination Process, Hearing before the Senate Judiciary Committee, 109th Congress*, (Sept. 12, 2005), https://www.uscourts.gov/educational-resources/educational-activities/chief-justice-roberts-statement-nomination-process (accessed Sept. 16, 2024) [https://perma.cc/6WG6-VZQ7]. If your favorite baseball team loses after an umpire calls a strike and the pitch was squarely inside the strike zone, it is reasonable to be disappointed about your team, but it is not reasonable to be outraged at rules being fairly applied. If a game is won or lost when an umpire calls a strike but the pitch clearly skidded on the ground in front of home plate, you should be outraged no matter which team was at bat.

**{¶ 102}** Given that the four members of this court in the majority today apparently think that the word " 'boneless' " means " 'you should expect bones,' " *Berkheimer v. REKM, L.L.C.*, 2024-Ohio-2787, ¶ 38 (Donnelly, J., dissenting), I'm sure it comes as no great surprise that they think that a constitutional amendment to "ban partisan gerrymandering" means to "require[] gerrymander[ing]." While the majority's Amelia Bedelia approach to the law and the absurdity of the majority's conclusions might make you laugh, it should also make you outraged. Everyone should be outraged by today's decision, regardless of whether one thinks the proposed constitutional amendment is a wonderful idea, a terrible idea, or anything in between.

**{¶ 103}** Accordingly, I dissent in part, and I fully join Justice Brunner's view that Secretary LaRose and the ballot board should be ordered to make revisions to the ballot language that are far more extensive than those ordered by the majority. I would also retain jurisdiction over the cause to ensure compliance with the court's orders.

———————————

**BRUNNER, J., joined by DONNELLY and STEWART, JJ., concurring in part and dissenting in part.**

## I. INTRODUCTION

{¶ 104} The majority of the members of respondent Ohio Ballot Board[13] either do not comprehend what the board may do when approving ballot language or have placed partisan interests above their oath-sworn duties to the people of Ohio. Article I, Section 2 of the Ohio Constitution unequivocally states that "[a]ll political power is inherent in the people." Every Ohio elected official takes an oath to follow the laws and the Constitution of the State of Ohio, and even the members of the ballot board who are not elected but appointed take that same oath. *See* R.C. 3.22. The Ohio Constitution forbids the ballot board from prescribing ballot language that, among other prohibited actions, misleads Ohio voters. Ohio Const., art. XVI, § 1. The majority opinion reflects an abject failure of this court to perform an honest constitutional check on the ballot board's work. We should be requiring a nearly complete redrafting of what is perhaps the most stunningly stilted ballot language that Ohio voters will have ever seen. The ballot board's actions, endorsed by a majority of this court, leave any objective observer scratching their head and asking, "Who's in charge here—Ohio's people or its politicians?"—which ironically is the essential issue the proposed constitutional amendment seeks to address.

{¶ 105} Compounding the ballot board's playing politics with the fundamental right of Ohioans to self-govern is this court's majority's complicity in allowing the ballot board's language to be presented to Ohio's voters. Ohioans have *all* political power reserved to themselves. And that power is not subordinate to the power of their elected officials but, rather, is denoted in the Constitution as

---

13. The individual members of the ballot board are respondents Secretary of State Frank LaRose (also the chair of the board), Senator Theresa Gavarone, Senator Paula Hicks-Hudson, William Morgan, and Representative Terrence Upchurch.

inherently belonging to them. *See* Ohio Const., art. I, § 2. In the document through which Ohioans speak with one voice—the Ohio Constitution—Ohioans have never delegated *all* power to their elected officials. *See id.* ("All political power is inherent in the people."). And at no time have the people of Ohio given so much of their power to elected officials that it could not be taken back. *See* Ohio Const., art. I, § 2 ("Government is instituted for their equal protection and benefit, and they [the people] have the right to alter, reform, or abolish the same, whenever they may deem it necessary . . . ."). Even when those elected and appointed officials deem unwise a proposal like the one before us today that takes back power from them, those public servants are duty-bound to fulfill their sworn oaths and present the proposal fairly to Ohio voters.

{¶ 106} What the ballot board has done here is tantamount to performing a virtual chewing of food before the voters can taste it for themselves to decide whether they like it or not. Elected leaders may not taint a proposal in an effort to persuade the voters to like it or dislike it. That is why the Constitution forbids ballot language that "mislead[s], deceive[s], or defraud[s] the voters," Ohio Const., art. XVI, § 1. And that is why the Constitution has made it the duty of this court to review ballot language when challenged and to invalidate it when it violates constitutional standards. *See id.* We have been called upon to undertake such a review here to fulfill that constitutional duty for the proposed amendment at issue, which aims, in part, "to ban partisan gerrymandering and redistricting plans that favor or disfavor a political party." Our duty in reviewing relators' challenge to the ballot board's actions is to ensure that Ohio voters know what they are being asked to vote on, *see State ex rel. Ohioans United for Reproductive Rights v. Ohio Ballot Bd.*, 2023-Ohio-3325, ¶ 54 (Brunner, J., concurring in part and dissenting in part).

{¶ 107} Regardless of how it is defined, gerrymandering is no doubt an evil enterprise. Gerrymandering typically involves (1) the dominant political party in government (2) drawing district lines with an intent to (a) entrench itself in power

45

and (b) disadvantage the minority party and/or its voters. *See Ohio A. Philip Randolph Inst. v. Householder*, 373 F.Supp.3d 978, 993 (S.D.Ohio 2019), *vacated on other grounds sub nom. Chabot v. Ohio A. Philip Randolph Inst.*, 140 S.Ct. 102 (2019). This court has stated that

> [g]errymandering is the antithetical perversion of representative democracy. It is an abuse of power—by whichever political party has control to draw geographic boundaries for elected state and congressional offices and engages in that practice—that strategically exaggerates the power of voters who tend to support the favored party while diminishing the power of voters who tend to support the disfavored party.

*Adams v. DeWine*, 2022-Ohio-89, ¶ 2.

**{¶ 108}** This court has enforced anti-gerrymandering provisions under the current constitutional framework, and we have invalidated Ohio's current district maps numerous times. *See generally id.; League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-65; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-342; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-789; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-1235; *League of Women Voters of Ohio v. Ohio Redistricting Comm.*, 2022-Ohio-1727; *Neiman v. LaRose*, 2022-Ohio-2471. Despite these efforts, Ohio's gerrymandering addiction persists. *See* Gerrymandering Project, *Redistricting Report Card*, https://gerrymander.princeton.edu/redistricting-report-card/?planId=recF5lGr0X QoZCeXn (accessed Sept. 15, 2024) [https://perma.cc/S5N8-HVR9] (giving Ohio's 2022 temporary congressional maps a grade of "D").

{¶ 109} Relators, including Citizens Not Politicians, the petition committee for the general-election ballot issue, are asking Ohio voters to consider a different method for drawing state legislative and congressional districts. They have proposed a constitutional amendment that they entitled, "An amendment to replace the current politician-run redistricting process with a citizen-led commission required to create fair state legislative and congressional districts through a more open and independent system." There is no requirement that this exact language be used in either the ballot title or within the body of the ballot language. Yet, the ballot language that the ballot board has approved describes the proposal as creating a commission that would be "required to gerrymander."

{¶ 110} Relators have asked us to order the ballot board to correct this and numerous other facets of the ballot language, which relators argue is misleading and inaccurate. I agree that a limited writ is in order, but I heartily disagree with where the majority has drawn the line. The proposed amendment aims to end in Ohio the practice of powerful government officials drawing legislative lines that effectively entrench their own political power at the expense of fair electoral competition. Unlike the 2022 election that resulted in the deeper entrenchment of gerrymandered majorities in the General Assembly and Ohio's congressional delegation, the vote on the proposed constitutional amendment at issue here will not be focused on district outcomes. The outcome of this year's vote will result in Ohio's body politic being heard in one voice about whether the current system of redistricting will stay or be replaced by the system proposed in the constitutional amendment placed before them for a vote. Ohio voters deserve accurate information so that they will know what they are being asked to vote on. This court's role is to ensure that the ballot language for the proposed amendment is not misleading, deceiving, or defrauding. The unwillingness of a majority of this court to act constitutionally fails Ohio voters. I therefore dissent.

## II.  ANALYSIS

### A.  *Review of ballot language*

{¶ 111} The ballot board is constitutionally required to prescribe ballot language that "shall properly identify the substance of the proposal to be voted upon."  Ohio Const., art. XVI, § 1; *see also* Ohio Const., art. II, § 1g.  This task is not an opportunity for the board to try to explain to the voters the consequences of a vote in favor or against a given proposal.  Nor may the board attempt to persuade voters to support or oppose a proposed amendment.  *State ex rel. One Person One Vote v. Ohio Ballot Bd.*, ¶ 8 (explaining that the ballot language may not amount to persuasive arguments for or against the issue).  The burden is on the relator to demonstrate through clear and convincing evidence that the board engaged in fraud or corruption, abused its discretion, or clearly disregarded applicable law in prescribing the ballot language.  *Ohioans United for Reproductive Rights*, 2023-Ohio-3325, at ¶ 65 (Brunner, J., concurring in part and dissenting in part).

{¶ 112} Relators have carried that burden by presenting clear and convincing evidence.  The board's use of misleading, inaccurate, and argumentative ballot language undermines the most significant power held by the people of Ohio: self-governance.  *See One Person One Vote* at ¶ 40 (Brunner, J., concurring in part and dissenting in part).  It is therefore this court's obligation to enforce "the fundamental principle that voters have the right to know what they are being asked to vote on."  *Ohioans United for Reproductive Rights* at ¶ 67 (Brunner, J., concurring in part and dissenting in part), citing *Jurcisin v. Cuyahoga Cty. Bd. of Elections*, 35 Ohio St.3d 137, 141 (1988).

### 1.  *Section one*

{¶ 113} The language prescribed by the ballot board in section one of the proposed amendment states that the amendment would "[r]epeal constitutional protections against gerrymandering approved by nearly three-quarters of Ohio electors participating in the statewide elections of 2015 and 2018, and eliminate the

longstanding ability of Ohio citizens to hold their representatives accountable for establishing fair state legislative and congressional districts." Relators take issue with the inclusion of information about the method and vote margins by which the current provisions of the Ohio Constitution were adopted. They argue that this information casts the current law in a favorable light and that by informing voters that they would be "repeal[ing]" these measures, the language is not impartial and is impermissibly argumentative.

{¶ 114} I agree. Although there is nothing misleading or inaccurate in stating that the proposed amendment would repeal the articles currently in the Ohio Constitution that govern redistricting, the added details serve no purpose other than to dissuade voters from voting for the amendment. Ballot language may not contain argument and may not be persuasive in nature. *Jurcisin* at 141-142. This ballot language also implies that Ohioans will be left with no "protections" against gerrymandering. Only twice in the proposed amendment is the term "gerrymandering" used. Each time it is used, it is within a sentence that provides further context for its meaning—specifically, the first use refers to "redistricting plans that favor or disfavor a political party," and the second similarly refers to "the use of redistricting plans that favor one political party and disfavor others." The ballot board's use of "gerrymandering," on the other hand. provides no benefits to the public, because it is misleading and impermissible argument against adopting the measure.

{¶ 115} Relators also claim that the second half of section one of the ballot language—which states that the proposed amendment would "eliminate the longstanding ability of Ohio citizens to hold their representatives accountable" for redistricting—is not a neutral statement about what the amendment would do. Not only is it not neutral, but the language is also not part of the proposal; it has been concocted by the ballot board to point out things about the amendment that the board wants voters to pay attention to that portray it as bad. But the ballot board is

not permitted to amplify what it perceives to be a negative consequence of a proposed amendment. *See State ex rel. Voters First v. Ohio Ballot Bd*., 2012-Ohio-4149, ¶ 29. The board's inclusion of the ballot language "eliminate the longstanding ability of Ohio citizens to hold their representatives accountable" for redistricting is very much like a server at a restaurant pointing out that no gravy comes with the mashed potatoes listed under the "side dish" section of the menu. Pointing out what is *not* there is inherently an expression of what might normally or should be there. That is not objective.

{¶ 116} A proposed constitutional amendment that would put citizens on a commission that performs a government function needs no further explanation. By adding negative language that is not remotely close to the proposed amendment's language, the ballot board crafted language to mislead voters into believing that there is something "bad" about the amendment—instead of omitting argumentative language and letting the voters make their decisions unfettered by the board's proselytizing.

{¶ 117} This section of misleading ballot language also suggests that citizens could hold only *elected* representatives and not citizens accountable for "establishing *fair* state legislative and congressional districts." (Emphasis added.) Because, under the proposed amendment, any citizen affected by *unfair* redistricting has the ability to seek redress in court, this language is patently false. *See* Proposed Amendment at § 8. This court should find the language in section one of the ballot language is misleading and deceptive and defrauds Ohio voters. We should require the ballot board to compose new ballot language that plainly and neutrally informs voters about the provisions that would become part of the Ohio Constitution if the amendment is approved. The board should be required to remove the reference to gerrymandering, the unnecessary details about how the current law was enacted, and the confusing language about representatives' accountability.

### 2. Section two

{¶ 118} The ballot language in section one becomes even more problematic when read in tandem with section two. Section two states that the proposed amendment would "[e]stablish a new taxpayer-funded commission of appointees *required to gerrymander* the boundaries of state legislative and congressional districts to favor either of the two largest political parties in the state of Ohio." (Emphasis added.) To state that the amendment would *require gerrymandering* is misleading, deceitful, and a fraud upon the voters. The proposed amendment says: "To *ban partisan gerrymandering* and prohibit the use of redistricting plans that favor one political party and disfavor others, the statewide proportion of districts in each redistricting plan that favors each political party shall correspond closely to the statewide partisan preferences of the voters of Ohio." (Emphasis added.) Proposed Amendment at § 6(B).

{¶ 119} The majority justifies the inclusion of ballot language stating that the proposed amendment would require gerrymandering based on its determination that what the amendment purports to do fits the "commonly understood" and dictionary definition of "gerrymandering." Majority opinion, ¶ 28-29. But the amendment already has made clear what it means to gerrymander: "the use of redistricting plans that favor one political party and disfavor others." Proposed Amendment at § 6(B). The amendment recognizes that the voters of the state will not be evenly split between voters who affiliate with various political parties or even between voters who are political-party-affiliated and those who are independent of any political party. That is why the amendment refers to proportionality and provides that "the statewide proportion of districts in each redistricting plan that favors each political party shall correspond closely to the statewide partisan preferences of the voters of Ohio." *Id.* By the amendment's very terms, this is not gerrymandering. For the majority to find otherwise is without basis, lacking in integrity, and inconsistent with the language that the proposed

amendment actually contains. When a majority of this court upholds as fair the work of a majority of the ballot board that denies Ohio voters honest language explaining what they are voting on, the majority of this court tosses out its own credibility—and does so on a matter of the gravest importance: protecting the political power of the people as set forth in the Ohio Constitution.

{¶ 120} Moreover, we need not consult dictionaries to provide a definition of what it means to gerrymander in this state—we have actual law for that. This court has already explained that partisan gerrymandering is "an abuse of power—by whichever political party has control to draw geographic boundaries for elected state and congressional offices and engages in that practice—that strategically exaggerates the power of voters who tend to support the favored party while diminishing the power of voters who tend to support the disfavored party." *Adams*, 2022-Ohio-89, at ¶ 2. The United States District Court for the Southern District of Ohio has also defined "gerrymandering." It has explained that gerrymandering occurs when (1) the dominant party in government (2) draws district lines with an intent to (a) entrench itself in power and (b) disadvantage the minority party and/or its voters. *See Ohio A. Philip Randolph Inst.*, 373 F.Supp.3d at 993.

{¶ 121} Thus, gerrymandering requires an intent on the part of the party holding power as well as a tangible harm to the party holding less power. *See* Justin Levitt, *Intent Is Enough: Invidious Partisanship in Redistricting*, 59 Wm. & Mary L. Rev. 1993, 2017 (2018). Districts may be drawn to favor political parties. "The 'central problem' is not determining whether a jurisdiction has engaged in partisan gerrymandering. It is 'determining when political gerrymandering has gone too far.' " *Rucho v. Common Cause*, 588 U.S. 684, 701 (2019), quoting *Vieth v. Jubelirer*, 541 U.S. 267, 296 (2004) (plurality opinion). And despite the claims of the majority, gerrymandering is not proportionality. Gerrymandering contemplates abuse; proportionality contemplates fairness—that is, districts' close

correspondence in their partisan political leanings to the partisan political leanings of the voters of the state.

{¶ 122} Under the proposed amendment, proportionality means that the numbers of districts that lean toward the first major party and the second major party, *see* Proposed Amendment at § 11 (defining these terms), reflect the overall partisan political leanings of the voters of the state. *Id.* at § 6(B)(1) through (3). To determine the partisan political leaning of each district, the amendment would ensure that there can be no more than a 3 percent deviation unless arithmetically impossible—again based on fairness. *Id.* To say that the amendment would require gerrymandering because it would require proportionality is not honest. Nor is it fair in its review of the ballot language.

{¶ 123} The proposed amendment includes factors that would need to be taken into account in addition to proportionality. But the majority of the ballot board appears to have been laser-focused on how it believes that proportionality erodes or swells entrenched partisan political power. Beyond proportionality, the amendment provides that the proposed redistricting commission should "to the extent possible"—and in descending order of priority—craft a plan with districts that are "reasonably equal in total population," generally "ensure the equal functional ability of . . . minorities to participate in the political process," and "preserve communities of interest to the extent practicable." *Id.* at § 6(C)(1) through (3).

{¶ 124} As today's majority opinion notes, this is similar—but linguistically different—from what Article XI, Section 6(A) of the Ohio Constitution already provides. The difference, according to the majority opinion, is that the standards under Article XI, Section 6 need only be "attempted" to be met. Majority opinion at ¶ 37. The majority's discussion of gerrymandering equates it with proportionality, and it finds that the proposed amendment requires

gerrymandering, while current law requires only *attempted* gerrymandering. This is nonsensical.

{¶ 125} This court has already acknowledged that the current law, Article XI, Section 6, was adopted as an "anti-gerrymandering amendment to the Ohio Constitution." *League of Women Voters of Ohio.*, 2022-Ohio-65, at ¶ 101. Although today's majority opinion calls proportionality "reverse gerrymandering" or "bipartisan gerrymandering," neither the proposed amendment nor the current Article XI, Section 6 of the *Ohio* Constitution, requires the dominant political party in government to draw districts with an intent to entrench itself in power and disadvantage the minority party and/or its voters. The gerrymandering addressed by the majority as was reviewed by the United States Supreme Court in *Davis v. Bandemer*, 478 U.S. 109 (1986), predates by 33 years the nation's high court ruling in *Rucho v. Common Cause*, 588 U.S. 684 (2019). In *Rucho*, the United States Supreme Court held that the question of generalized partisan preferences in states' redistricting litigation is a question of state law, *see id.* at 718, and that the Court's " 'constitutionally prescribed role is to vindicate the individual rights of the people appearing before it,' " *id.* at 709, quoting *Gill v. Whitford*, 585 U.S. 48, 72 (2018). The ballot board fixates on what is "favoring" a political party. The majority cannot fully agree on what that means. The concurring justice has a different interpretation of what the ballot language means when it says that the commission would be "required to gerrymander." What the voters are not told in the ballot language is that the amendment's use of the term "political-party affiliation" is focused on *voter* partisan affiliation statewide for the purpose of creating fair representation. Thus, proportionality is to reflect the elective body's partisan preferences.

{¶ 126} And even though a number of those in the majority have never agreed with the application of the current constitutional requirements on proportionality, that does not mean that the similar provisions in the proposed amendment are gerrymandering. *See League of Women Voters of Ohio*, 2022-Ohio-

342, at ¶ 124 (Kennedy, J. dissenting) (accusing this court of requiring intentional gerrymandering because we ordered the Ohio Redistricting Commission to produce a General Assembly map that complied with the proportionality requirements in Article XI, Section 6(B) of the Ohio Constitution). If using proportionality to draw district lines were—for the sake of argument—gerrymandering, then the ballot language in section one stating that this amendment would repeal constitutional "protections *against* gerrymandering" (emphasis added) has no basis in fact and defrauds Ohio voters.

{¶ 127} The ballot board's language in section two also states that the proposed amendment's "require[ment] to gerrymander" would be done "according to a *formula based on partisan outcomes* as the dominant factor." (Emphasis added.) That language is misleading because the amendment's formula would prioritize proportionality in drawing state legislative and congressional district lines, but the ballot language characterizes it as being based on "partisan political outcomes," connoting a sinister "cooking the books"-approach to map drawing. The amendment's phrase "partisan preferences" refers to Ohio voters' past voting patterns; "political outcomes," on the other hand, refers to who gets elected, which is the aim of gerrymandering. This ballot language further misleads the voters.

{¶ 128} The ballot language in section two is misleading and inappropriately argues against the proposed amendment. Read in tandem with section one, these two sections of the ballot language deny Ohio voters a fair statement of what they are being asked to vote on.

*3. Section three*

{¶ 129} Section three of the ballot language states that the proposed amendment would "[r]equire that a majority of the partisan commission members belong to the state's two largest political parties." This language does not accurately reflect the makeup of the redistricting commission proposed by the amendment. Instead, this language paints the commission as politically partisan,

even though the amendment explicitly excludes persons who are current and recent elected officials, candidates, political consultants, lobbyists, political contractors, and staff members—along with immediate family members of those persons—from serving on the commission or participating in the commission-member selection process. *See* Proposed Amendment at § 3(C).

{¶ 130} The proposed amendment states that the new redistricting commission would consist of 15 members "who have shown an ability to conduct the redistricting process with impartiality, integrity, and fairness." *Id.* at § 1(C). The amendment would require the commission to be composed of five of the members affiliated with the party whose candidate for governor in the last election for that office received the most votes, five members affiliated with the party whose candidate for governor in the last election for that office received the second highest number of votes, and five members who are independent. *Id.* at § 1(C)(1) through (3). The amendment would not require that any commission "belong to" any political party. It provides that "[p]arty affiliation" shall be based on a commission applicant's voting record in primaries and "various other relevant factors including, but not limited to, political contributions campaign activities, and other reliable indicia of party affiliation." *Id.* at § 2(D)(2)(a).

{¶ 131} In other words, a person who has never attended a political meeting in their life but simply requests a political-party ballot to vote for candidates in a primary election is deemed by this ballot language to be a "member" of a political party, even though the proposed amendment addresses only party affiliation. The ballot language is misleading in how it emphasizes the politics of the members of the proposed redistricting commission. This court has discussed at length the tenor and import of party affiliation, finding that it is "purely a matter of self-identification, and that self-identification is subject to change." *State ex rel. Stevens v. Fairfield Cty. Bd. of Elections*, 2018-Ohio-1151, ¶ 20. We have also explained:

A voter cannot register as an independent, except in the negative sense of not voting in partisan primaries or signing partisan nominating petitions. The Revised Code contains no provision for declaring party affiliation when one registers to vote, *State ex rel. Young v. Gasser*, 21 Ohio St.2d 253, 255, 257 N.E.2d 389 (1970), and the registration forms do not contain a space for that information. Rather, party affiliation or membership is "that which [the voter] desires it to be from time to time." *Id.* at 257. Essentially, being "registered" as a Republican or Democrat means nothing more than voting in that party's primary, because the local boards of elections keep records of that information.

(Bracketed language added in *Coughlin*). *State ex rel. Coughlin v. Summit Cty. Bd. of Elections*, 2013-Ohio-3867, ¶ 28, fn. 2. The ballot language informs voters that under the proposed amendment, a majority of the commission members would belong to the two largest political parties, but the ballot language does not indicate the full makeup of the commission or how the political-party affiliation, if any, of the proposed redistricting commission members would be determined.

{¶ 132} Section three of the ballot language withholds material information from voters and instead creates the impression that the proposed redistricting commission's required partisan makeup would cause it to run amok in meeting its supposed gerrymandering mandate. What this court instead should focus on is the following: "[A]ny omitted substance of the proposal must not be material, i.e., its absence must not affect the fairness or accuracy of the text." *See Voters First*, 2012-Ohio-4149, at ¶ 30.

{¶ 133} The majority opinion reasons that the missing information can be found in another section of the ballot language, majority opinion at ¶ 44, and that inclusion of the information omitted in this section of the ballot language would

have cost conciseness in the ballot language, *id.* at ¶ 45. But the defect in section three is not remedied by burying the needed information in the morass that is section six of the ballot language, which states:

> Create the following process for appointing commission members: Four partisan appointees on the Ohio Ballot Board will choose a panel of 4 partisan retired judges (2 affiliated with the first major political party and 2 affiliated with the second major political party). Provide that the 4 legislative appointees of the Ohio Ballot Board would be responsible for appointing the panel members as follows: the Ballot Board legislative appointees affiliated with the same major political party would select 8 applicants and present those to the Ballot Board legislative appointees affiliated with the other major political party, who would then select 2 persons from the 8 for appointment to the panel, resulting in 4 panel appointees. The panel would then hire a private professional search firm to help them choose 6 of the 15 individuals on the commission. The panel will choose those 6 individuals by initially creating a pool of 90 individuals (30 from the first major political party, 30 from the second major political party, and 30 from neither the first nor second major political parties). The panel of 4 partisan retired judges will create a portal for public comment on the applicants and will conduct and publicly broadcast interviews with each applicant in the pool. The panel will then narrow the pool of 90 individuals down to 45 (15 from the first major political party; 15 from the second major political party; and 15 from neither the first nor second major political parties). Randomly, by draw, the 4 partisan retired judges will then blindly select 6 names out of the pool of 45 to be members

of the commission (2 from the first major political party; 2 from the second major political party; and 2 from neither the first nor second major political parties). The 6 randomly drawn individuals will then review the applications of the remaining 39 individuals not randomly drawn and select the final 9 individuals to serve with them on the commission, the majority of which shall be from the first and the second major political parties (3 from the first major political party, 3 from the second major political party, and 3 from neither the first nor second major political parties).

{¶ 134} If the ballot board's intent in crafting section six of its ballot language was to cause readers' eyes to glaze over, the board seems to have accomplished it. Ohio voters are unlikely to find the information they do not even know to look for in this disjointed and choppy passage of the ballot language.

{¶ 135} And section six of the ballot language continues the hyperbolic use of "partisan" to describe members of the screening panel, which would act to initiate the process of choosing the members of the redistricting commission under the proposed amendment. This creates more misleading ballot language. The proposed amendment specifically contemplates a "Bipartisan Screening Panel," Proposed Amendment at § 2. The ballot board chose to drop the "bi-" prefix and instead use "partisan," which objectively is a less favorable term. "Partisan" is defined as "a firm adherent to a party, faction, cause, or person *especially*: one exhibiting blind, prejudiced, and unreasoning allegiance[;] political *partisans* who see only one side of the problem." (Emphasis in original.) *Merriam-Webster Dictionary Online*, https://www.merriam-webster.com/dictionary/partisan (accessed Sept. 15, 2024) [https://perma.cc/L2MY-LWK8].

{¶ 136} This court should require the ballot board to rewrite section three of the ballot language, either by composing neutral language or by using the

language contained in the proposed amendment to explain the composition of the proposed redistricting commission.

*4. Section four*

**{¶ 137}** Section four of the ballot language states that the proposed amendment would "[p]revent a commission member from being removed, except by a vote of their fellow commission members, even for incapacity, willful neglect of duty or gross misconduct." Again, the ballot board's language is misleading, lacks neutrality, and is plainly not truthful.

**{¶ 138}** As proposed, the amendment would vest the proposed redistricting commission with the sole power to remove one of its members, authorizing removal in instances of incapacity, willful neglect of duty, or gross misconduct. *See* Proposed Amendment at § 4(C)(3) and (4). The ballot language is misleading because it suggests that the proposed amendment would "prevent" the commission from doing what it is empowered and required to do—remove a member for disqualifying conduct. While the ballot board may choose its own words in crafting ballot language, *see State ex rel. Cincinnati for Pension Reform v. Hamilton Cty. Bd. of Elections*, 2013-Ohio-4489, ¶ 52, the board's choice of words must not operate as a sleight of hand obscuring the substance of the proposal to be placed before the voters, *see id.*, quoting *Voters First*, 2012-Ohio-4149 at ¶ 26, quoting *State ex rel. Bailey v. Celebrezze*, 67 Ohio St.2d 516, 519 (1981) ("The duty of the board is to ensure that the ballot language it approves does not '"mislead, deceive, or defraud the voters"' ").

**{¶ 139}** This court should require the ballot board to correct the ballot language so that voters can understand that under the proposed amendment, members of the proposed redistricting commission would be authorized to remove fellow members of the commission for the reasons outlined in the amendment.

*5. Section nine*

{¶ 140} Section nine of the ballot language states that the proposed amendment would "[r]equire the commission to immediately create new legislative and congressional districts in 2025 to replace the most recent districts *adopted by the citizens of Ohio through their elected representatives*." (Emphasis added.) Incredibly, this language tells Ohio voters that *they* adopted the latest set of district maps. This court repeatedly found the redistricting plans of the Ohio Redistricting Commission to be unconstitutional. *See League of Women Voters of Ohio*, 2023-Ohio-4271, at ¶ 21 (Brunner, J., dissenting) ("We have found five times that *district maps produced by the commission* violated Article XI, Section 6." [emphasis added]). A majority of the Ohio Redistricting Commission—elected officials—repeatedly ignored this court's orders directing the commission to create constitutional maps. *Id.* at ¶ 22 ("[The Ohio Redistricting Commission] has taken the unprecedented position of refusing to comply with our orders, delaying these cases, and disobeying our deadlines"). The ballot language in section nine specifying that the recent district maps were "adopted by the citizens of Ohio through their elected representatives" is an arrogant affront to the fairness required under the Ohio Constitution that Ohio voters not be misled, deceived, or defrauded, Ohio Const., art. XVI, § 1. This court should require the ballot board to remove the offending language from section nine.

***B. Ballot title***

{¶ 141} The secretary of state determines the ballot title for a proposed constitutional amendment. As a member of the ballot board, the chair, the secretary of state, has the duty to "give a true and impartial statement of the measures in such language that the ballot title shall not be likely to create prejudice for or against the measure." R.C. 3519.21. The petitioners' committee is permitted to submit a proposed title, "which shall be given full consideration by the secretary of state or board in determining the ballot title." *Id.*

{¶ 142} Here, the petitioners' committee proposed the following ballot title: "Amendment to the Constitution setting forth a structure and criteria to govern the process for drawing Ohio General Assembly and Ohio Congressional districts." The board inserted and certified the following title: "To create an appointed redistricting commission not elected by or subject to removal by the voters of the state." This is cherry-picking (that is, selecting what is the most desirable to the drafter) and not a "true and impartial statement of the measure" to be voted on by Ohio voters, and violates Ohio law. And even if the language contains elements of truth, it is partial in the sense that it is both incomplete and inclined to disfavor the proposed amendment.

{¶ 143} The board-certified title centrally focuses on the fact that the members of the proposed redistricting commission would be appointed, even though that is not the central focus of the proposed amendment. The title goes on to slant this nugget—of which the majority, too, continues to emphasize—and does so repetitively, stating that the commission members would be not only "appointed" but also "not elected" and not "subject to removal by the voters." The title of the ballot language violates the law by not being a true and impartial statement of the measure, and it is likely to create prejudice against the measure.

{¶ 144} Voters should be informed from the ballot title that this amendment proposes to establish an Ohio Citizen Redistricting Commission and should set forth a process for how the General Assembly and congressional districts will be drawn in Ohio. This court should order the secretary of state to prescribe a title that complies with the law, using complete and neutral language to reflect an accurate and impartial statement of the ballot measure to be voted on.

### III. CONCLUSION

{¶ 145} I concur in the mandamus relief granted by the majority, in its granting the pending motion for leave to withdraw, and in its denying the motion to strike as moot. But I dissent from the rest of the majority opinion because I find

the majority's instructions to the secretary of state and the ballot board to be grievously inadequate, and I would further order the board to adopt ballot language that:

(1) neutrally informs voters about the constitutional provisions that would be repealed if the proposed amendment is approved and removes references to gerrymandering in section one of the ballot language;

(2) neutrally and truthfully informs voters about the redistricting commission that would be created under the proposed amendment and how districts would be drawn and removes the deceptive language "required to gerrymander" and "partisan outcomes" in section two of the ballot language;

(3) accurately informs voters about the partisan affiliations of the members of the proposed redistricting commission in section three of the ballot language;

(4) accurately informs voters that a member of the proposed redistricting commission could be removed by other commissioners for cause, including incapacity, willful neglect of duty, or gross misconduct under section four of the ballot language;

(5) neutrally and accurately informs voters about the creation of new maps and removes language that misleads voters about who adopted the last district maps.

**{¶ 146}** I would also order the secretary of state and the ballot board to draft a ballot title for the proposed amendment using complete and neutral language to reflect an accurate and impartial statement of the measure to be voted on. Finally, because of the exigencies of the impending election and to ensure a fair ballot-issue election, I would retain jurisdiction over this matter to ensure compliance with this court's writ.

_____

McTigue & Colombo, L.L.C., and Donald J. McTigue; and Elias Law Group, L.L.P, and Ben Stafford, Emma Olson Sharkey, Jyoti Jasrasaria, and Omeed Alerasool, for relators.

Dave Yost, Attorney General, and T. Elliot Gaiser, Solicitor General, Katie Rose Talley, Deputy Solicitor General, Julie M. Pfeiffer, Michael A. Walton, Stephen P. Tabatowski, Kristopher A. Haines, and Mark D. Tucker, Assistant Attorneys General, for respondent Ohio Ballot Board.

Dave Yost, Attorney General, and Jonathan D. Blanton, Julie M. Pfeiffer, Michael A. Walton, Stephen P. Tabatowski, Kristopher A. Haines, and Mark D. Tucker, Assistant Attorneys General, for respondent Secretary of State Frank LaRose.

UB Greensfelder, L.LP., and Dolores P. Garcia; and Simone T. Leeper, for amicus curiae Campaign Legal Center, in support of relators.

Jack F. Fuchs, amicus curiae in support of relators.

Brian J. Eastman and Kelly L. Phillips, for amicus curiae Ohio Education Association, in support of relators.

Beryl J. Piccolantonio, for amicus curiae Leaders of the Ohio Senate and House Democratic Caucuses, in support of relators.

Zagrans Law Firm, L.L.C., and Eric H. Zagrans, for amicus curiae Professors Nicholas O. Stephanopoulos, Edward B. Foley, Ruth M. Greenwood, David Niven, and Dan Tokaji, in support of relators.

Langdon Law, L.L.C., and David R. Langdon and Riley E. Kane, for amicus curiae Ohio Works, in support of respondents.

BakerHostetler, L.L.P., and Patrick T. Lewis, for amicus curiae American Redistricting Project, in support of respondents.

Clark Hill, P.L.C., and Anthony A. Agosta, for amicus curiae Black Equity & Redistricting Fund, in support of respondents.

———————————